JOHNSON, J.
*158 ¶ 1 This case involves the issue of whether a prosecutor's closing argument asserting a victim was "groomed" by the defendant, where testimony of grooming was disallowed during trial, constitutes flagrant and ill-intentioned misconduct requiring reversal. The Court of Appeals, Division Two, granted Todd Phelps's personal restraint petition (PRP) and reversed his convictions for third degree rape and sexual misconduct with a minor.[1] The Court of Appeals held that expert *1144 testimony is required if the State intends to rely on grooming to argue and prove its case. Thus, because the prosecutor did not provide expert testimony, the Court of Appeals found that the prosecutor argued facts not in evidence during his closing argument. The Court of Appeals held that the prosecutor's actions constituted flagrant and ill intentioned misconduct and that Phelps had shown the misconduct caused him actual and substantial prejudice. In re Pers. Restraint of Phelps, 197 Wash. App. 653, 389 P.3d 758, review granted, 189 Wash.2d 1001, 403 P.3d 38 (2017).
¶ 2 We reverse the Court of Appeals on both issues and hold that under the facts and charges involved in this case, *159 expert testimony on grooming was not required and the use of the term "grooming" during closing argument did not amount to arguing facts not in evidence. The prosecutor also did not commit flagrant and ill-intentioned misconduct, nor has Phelps shown that if misconduct occurred it caused him actual and substantial prejudice.
FACTS
¶ 3 Phelps was an assistant coach for the Pe Ell School girls' softball team. During the summer of 2010, Phelps took his family and members of the team to tournaments most weekends. One of those team members was A.A., a 16-year-old who had a strained relationship with her own parents. A.A. was dealing with several emotional issues: she cut herself, experienced depression, and had contemplated suicide.
¶ 4 Once softball season started in February 2011, A.A. told Phelps she had been cutting herself and had considered suicide. Over the next several months, Phelps continued to talk with A.A. about her self-harm, her suicidal thoughts, and other personal issues. Phelps also told A.A. personal stories involving his sexual experiences with women. According to A.A., Phelps explained that this was so she could have dirt on him because he now had dirt on her. Over time, Phelps and A.A. developed a relationship of in-person conversations, phone calls, and frequent texts, sometimes late into the night.
¶ 5 Phelps also had A.A. show him where she cut herself at or near the tops of her thighs, which required her to pull her pants halfway down. This happened several times. Each time A.A. showed him her cuts, some kind of sexual contact occurred; the contact escalated each time. During softball team trips, several instances of Phelps inappropriately grabbing parts of A.A.'s body occurred. A.A. eventually told Melody Porter, her youth pastor's wife, that she and Phelps had kissed. Porter reported the kiss to the school superintendent and Phelps was placed on administrative leave.
*160 ¶ 6 With A.A.'s parents' consent, Phelps was reinstated as softball coach. Several people, including members of the school board and A.A.'s parents, instructed Phelps not to text A.A. anymore and to maintain an appropriate coach/player relationship. Disregarding these warnings, Phelps and A.A. continued to communicate on a near daily basis. When school officials discovered Phelps and A.A. were still communicating, Phelps was forced to resign as coach in late April 2011 and A.A.'s father told him not to have any further contact with A.A. However, Phelps and A.A. continued to communicate.
¶ 7 Phelps and A.A. met several times in July while A.A. was with a friend. At some point, Phelps talked with a coworker about how he could control A.A.'s emotions. Phelps and A.A. eventually met in private at Phelps's brother's house, where A.A. again showed Phelps her cuts. According to A.A., Phelps then forced her to have sex with him. Soon after, A.A. went to go live with an aunt in Auburn. About two months after the alleged rape occurred, A.A. told her parents she had had sex with Phelps. Her parents called the sheriff and reported the rape.
¶ 8 Phelps was charged with one count of third degree rape and one count of sexual misconduct with a minor. At trial, during voir dire, the prosecutor asked potential jurors if they had ever heard of grooming and if they *1145 knew anything about it; several jurors responded. No indication exists in the record that the prosecutor talked about grooming in his opening statement. The focus of the claimed misconduct arises in the context of closing argument.
¶ 9 The term "grooming" came up twice during trial testimony. The first time was during A.A.'s father's testimony. The prosecutor asked him what he thought Phelps's intentions were. Defense counsel objected as to speculation, but the trial judge overruled the objection. A.A.'s father responded, "I believe [Phelps's] intentions were dishonorable. I believe he was grooming her to the end result of what he did. He ended up raping her on the 27th." 2 Verbatim *161 Report of Proceedings (VRP) (Apr. 18, 2012) at 180. Defense counsel did not object to this response. The second time grooming came up was during the testimony of Yvonne Keller, the other softball coach. The prosecutor asked her if she believed Phelps was grooming A.A. Keller said she did just as defense counsel objected as to her belief. The court sustained the objection. The prosecutor then asked Keller if she knew anything about grooming. Defense counsel objected to relevance, and the judge said, "That's an issue that is for expert testimony. She is not an expert. She's already stated she's not an expert. So I'm sustaining the objection." 2 VRP (Apr. 18, 2012) at 211.
¶ 10 During closing arguments, the prosecutor went through the witnesses' testimony and explained how the evidence showed A.A.'s isolation and vulnerability, how A.A. trusted Phelps, Phelps's position of authority, how Phelps bragged about being able to control A.A.'s emotions, and how Phelps selectively disclosed A.A.'s secrets to others to keep the spotlight on her. The prosecutor also discussed the day of the alleged rape in detail, as well as both A.A.'s and Phelps's credibility.
¶ 11 The prosecutor used the term "groom" or "grooming" 19 times during his argument and rebuttal. He referenced the jurors' remarks during voir dire about grooming. He also pointed out the continuous, secretive nature of grooming, telling the jury that grooming does not happen out in the open and that it is a constant process happening all the time. He stated that A.A. was a "prime candidate" to be groomed because of her low self-esteem and stressed relationship with her family. 8 VRP (Apr. 26, 2012) at 1540. He argued that Phelps was not only grooming A.A. but also grooming her family and friends around her to make himself appear concerned about A.A.'s mental health. The prosecutor discussed Phelps's repeated efforts to desensitize A.A. to sexual contact, arguing that because of grooming, Phelps knew A.A. was not going to respond to his escalating sexual advances. He used a similar argument to explain Phelps's sexually explicit remarks *162 to A.A. and his efforts to isolate her by having her break up with her boyfriend and stop talking to her counselor. The prosecutor also argued grooming explained some aspects of A.A.'s behavior, such as her efforts to protect Phelps by deleting their text messages and her apparent obsession with him. Toward the end of his closing, the prosecutor told the jury, "We're here because of grooming, we're here because of deceit, concealment, half-truths, misrepresentations." 8 VRP (Apr. 26, 2012) at 1548.
¶ 12 The prosecutor's closing argument was accompanied by 97 PowerPoint slides, 8 of which mentioned grooming. The defense attorney did not object to the prosecutor's use of grooming in his closing argument or to the PowerPoint slides. Phelps's trial defense apparently was that he did not commit the crimes because he was not there, but even if he did have sex with A.A., she consented. The jury found Phelps guilty on all counts, including the aggravating circumstances.
¶ 13 Phelps filed an initial appeal. The Court of Appeals, Division Two, affirmed,[2] and Phelps filed a petition for review, which we denied. State v. Phelps, 181 Wash.2d 1030, 340 P.3d 228 (2015). Phelps then filed *1146 this PRP in the Court of Appeals, raising the issue of prosecutorial misconduct. The Court of Appeals granted the PRP and reversed Phelps's convictions. The State filed a motion for discretionary review, and we granted review.
ISSUES
(1) Whether the State is required to present expert testimony if it intends to use the concept of grooming to argue its case to a jury.
*163 (2) Whether, by referencing grooming in closing argument, the prosecutor committed flagrant and ill-intentioned misconduct.
ANALYSIS
¶ 14 The first issue is whether expert testimony is required when the State uses the concept of grooming to argue its case to a jury. While we have never addressed when and under what circumstances expert testimony on grooming is admissible, several jurisdictions have held it is admissible, but not that it is required. See Jones v. United States, 990 A.2d 970, 978 (D.C. 2010) ; State v. Berosik, 2009 MT 260, 352 Mont. 16, 23-24, 214 P.3d 776 (2009) ; Morris v. State, 361 S.W.3d 649, 669 (Tex. Crim. App. 2011). States are divided on whether expert testimony is required where the State intends to use grooming to argue its case. Compare State v. Akins, 298 Kan. 592, 315 P.3d 868 (2014), and State v. Sena, 2008-NMSC-053, 144 N.M. 821, 192 P.3d 1198, with Dandass v. State, 233 So. 3d 856, 2017 WL 1709396 (Miss.App.), cert. denied, 230 So.3d 1023 (Miss. 2017).
¶ 15 Because this is an evidentiary issue, we evaluate it through the lens of our Rules of Evidence (ER). Washington's rule on expert witnesses provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. Our rule allows an expert to testify about his or her specialized knowledge if it would help the jury understand the evidence, but the rule does not require expert testimony where it would not be helpful to the jury. It is within the sound discretion of trial judges to determine the admissibility of evidence pursuant to ER 702 and ER 403.
¶ 16 The only published Washington case dealing with expert testimony and grooming is *164 State v . Braham, 67 Wash. App. 930, 841 P.2d 785 (1992). In that case, the trial judge, over the defense's objection, allowed an expert to testify on the general characteristics of grooming. In closing argument, the prosecutor exhorted the jury to infer the defendant's guilt based on the expert's testimony. The prosecutor argued the elements of grooming present in that case were substantial circumstantial evidence supporting " 'that in fact' " the defendant had molested the child. Braham, 67 Wash. App. at 934, 841 P.2d 785. The Court of Appeals in reversing held that such profiling evidence implying guilt based on characteristics of known offenders was inadmissible.
¶ 17 In this case, Phelps argues that Braham establishes that grooming evidence is per se inadmissible. We disagree. The Braham court expressly did not hold "that such evidence will always be inadmissible" and described several situations in which grooming evidence may be appropriate and admissible. Braham, 67 Wash. App. at 939, 841 P.2d 785. In reversing the defendant's conviction, the Braham court was sensitive to the prejudicial effect and weight expert testimony may have for jurors, potentially leading them to consider expert grooming testimony to be evidence of a defendant's guilt. We have similarly recognized the concern that jurors may assign inappropriate weight to expert testimony simply because it comes from someone the court has deemed an expert. See State v. Black, 109 Wash.2d 336, 348-49, 745 P.2d 12 (1987).
¶ 18 In Phelps's trial, expert testimony was not offered or admitted by the State. One witness, without objection, opined about Phelps's motivation and testified he thought Phelps had groomed A.A. After a relevance objection, the trial court disallowed a lay witness to express an opinion on whether she believed Phelps was grooming the victim. Based on this record, this case does not *1147 present the issue of under what circumstances expert testimony may be required or allow us to determine whether a trial court's decision to admit expert testimony requires reversal. Instead, we focus on the prosecutor's use of grooming in closing argument *165 and whether the State committed misconduct by arguing facts not admitted during trial.
¶ 19 Once we accept review of a PRP, we review pure questions of law de novo. In re Pers. Restraint of Coats , 173 Wash.2d 123, 133, 267 P.3d 324 (2011). Under this standard of review, we discuss the burden as it rests on Phelps to prevail in his PRP; the record must establish the underlying claim he brought in his PRP. A personal restraint petitioner raising a prosecutorial misconduct claim must prove the misconduct was either a constitutional error resulting in actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice. In re Pers. Restraint of Lui, 188 Wash.2d 525, 539, 397 P.3d 90 (2017) (citing In re Pers. Restraint of Cross, 180 Wash.2d 664, 676-77, 327 P.3d 660 (2014) ). This principle arises under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution, which guarantee the right to a fair trial; prosecutorial misconduct may deprive a defendant of this right.[3] In re Pers. Restraint of Glasmann, 175 Wash.2d 696, 703-04, 286 P.3d 673 (2012) (plurality opinion).
¶ 20 Because Phelps did not object during trial, his prosecutorial misconduct claim is considered waived unless the misconduct is " ' "so flagrant and ill-intentioned that it cause[d] an enduring and resulting prejudice that could not have been neutralized by a curative instruction." ' " Lui, 188 Wash.2d at 539, 397 P.3d 90 (alteration in original) (quoting In re Pers. Restraint of Caldellis, 187 Wash.2d 127, 143, 385 P.3d 135 (2016) (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997) ) ). When evaluating whether misconduct is flagrant and ill intentioned, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and *166 more on whether the resulting prejudice could have been cured." State v. Emery, 174 Wash.2d 741, 762, 278 P.3d 653 (2012). In other words, prosecutorial misconduct is flagrant and ill intentioned only when it crosses the line of denying a defendant a fair trial.
¶ 21 Put simply, to prevail in his PRP, Phelps must overcome three hurdles. First, he must show the prosecutor committed misconduct. Second, because he did not object during trial, Phelps must show that misconduct was flagrant and ill-intentioned and caused him prejudice incurable by a jury instruction. Third, because he raises this issue in a PRP, Phelps must show the prosecutor's flagrant and ill-intentioned misconduct caused him actual and substantial prejudice. We address each of these hurdles in turn.
¶ 22 The Court of Appeals held that in arguing grooming to the jury without presenting expert testimony, the prosecutor argued facts not in evidence, which constituted flagrant and ill-intentioned misconduct. First, we must determine if the prosecutor committed misconduct. Because the underlying claim is the prosecutor argued facts not in evidence, we must discuss in general terms what a fact is. A "fact" is "[s]omething that actually exists; an aspect of reality." BLACK'S LAW DICTIONARY 709 (10th ed. 2014). A "fact in evidence" is "[a] fact that a tribunal considers in reaching a conclusion." BLACK'S , supra, at 710. An "inference," on the other hand, is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." BLACK'S , supra, at 897.
¶ 23 Definitions are only marginally helpful; there are no objective criteria to distinguish between facts, inferences, and facts not in evidence. Facts are the responses to the "who, what, where" questions prosecutors ask at trial. Witnesses respond with their versions of the events giving rise to the charges through which the State establishes *1148 the elements of the offense. In contrast, prosecutors have "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *167 State v . Thorgerson, 172 Wash.2d 438, 448, 258 P.3d 43 (2011). Prosecutors are free to argue their characterization of the facts presented at trial and what inferences these facts suggest in closing argument. Jurors are also specifically instructed not to consider closing arguments as evidence, which further helps draw the line between fact and argument. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 21 (4th ed. 2016).
¶ 24 Depending on how the concept is used, grooming can be a fact. For example, the prosecutor in Braham argued that because aspects of grooming were present in that case, their presence was circumstantial evidence of the defendant's guilt. Thus, the prosecutor in that case encouraged the jury to consider grooming as a fact in evidence in reaching its ultimate conclusion about the defendant's guilt, which the Braham court held was impermissible and reversed.
¶ 25 Here, the prosecutor was not using grooming in the same manner. Instead, he used grooming to paint a picture of the evidence for the jury. Grooming is descriptive of how Phelps's and A.A.'s relationship began, developed, and expanded and in reality has or adds little value to what the State needed to prove: that Phelps committed the crimes. The facts and the way the facts fit together are two different things. The prosecutor's comments connecting the evidence to grooming are more akin to permissible inferences drawn from the evidence than arguing facts not in evidence.
¶ 26 The Court of Appeals held the prosecutor had committed misconduct, in part, because the grooming evidence was intended to rebut Phelps's claims that he was merely trying to help A.A. deal with her personal issues. Phelps, 197 Wash. App. at 682-83, 389 P.3d 758. However, it is not misconduct for a prosecutor to argue the evidence does not support the defense theory; prosecutors are entitled to respond to defense counsel's arguments. State v . Russell, 125 Wash.2d 24, 87, 882 P.2d 747 (1994). Whether the defense's theory *168 that Phelps was genuinely concerned about A.A. and thus maintained contact with her has no bearing on the jury's ultimate determination of whether Phelps committed the crimes of which he was accused.[4] Likewise, whether Phelps actually groomed A.A., per the prosecutor's theory, is similarly establishing the background of Phelps's and A.A.'s relationship and is not key to the jury's determination of Phelps's guilt.
¶ 27 Especially in this case, which involved the aggravators of abuse of trust and vulnerability, the prosecutor understandably explained the evidence in the context of Phelps's relationship with A.A. to establish a basis for these aggravating circumstances. Even if prohibited from using the term "grooming" without expert testimony, the prosecutor could have explained the evidence using grooming-related concepts, such as developing trust, isolation, and manipulation. We have never held that jurors need expert testimony to establish that a defendant manipulated or controlled someone; jurors can understand these concepts based on common sense and experience. We have trouble envisioning a world in which experts must be called into court to explain trusting relationships to jurors. Indeed, expert testimony may have lent inappropriate weight to the issue of grooming, which did not go to the ultimate determination of Phelps's guilt.
¶ 28 The State argues the prosecutor could have replaced "groomed" with the word "manipulated" for the same effect in closing argument. We agree. The State did, in fact, use those words interchangeably during its closing argument. See 8 VRP (Apr. 26, 2012) at 1540 (describing A.A. as "a prime candidate for grooming, to be manipulated"). Little meaningful difference exists between the prosecutor's comments and arguing Phelps had developed a "trusting relationship" with A.A. or manipulated her. Various witnesses *169 testified about Phelps's interactions with A.A. and her family, her vulnerability *1149 as a troubled teenager, and the evolution of Phelps's relationship with her.[5] The prosecutor summarized this extensive testimony, alluding to grooming only in that it was relevant to the context of Phelps's and A.A.'s relationship. We find no support for Phelps's claim the prosecutor presented his own invented definition of grooming to the jury, and even if this were the case, prosecutors are free to characterize the evidence to tell their story in closing argument. Furthermore, the jury was instructed closing arguments were not evidence and it could consider only the testimony and exhibits in reaching its verdict.
¶ 29 We also find no suggestion the prosecutor used grooming as profiling evidence or to argue Phelps was guilty because he had engaged in grooming.[6] The prosecutor thoroughly discussed the date of the rape itself, and any credibility arguments he made centered on the differences between Phelps's and A.A.'s accounts of what happened that day. We hold the prosecutor in this case did not commit misconduct. He did not argue facts not in evidence, and his comments in closing argument were not central to the verdict reached by the jury.[7]
¶ 30 It is the responsibility of trial courts to apply the standards for admissibility of expert testimony under ER 702 and the Rules of Evidence. Unlike closing arguments, which jurors are specifically instructed are not evidence, there is no similar instruction offering jurors guidance on how to interpret expert testimony, which is offered *170 to them as evidence or to assist in understanding evidence. As alluded to earlier, cases express concern about the weight jurors might give to an expert opinion, so trial courts should be hesitant to admit expert testimony on grooming. We reverse the Court of Appeals and hold the concept of grooming, as used in this case, is within the common knowledge of jurors and the State was not required to present expert testimony to argue grooming to the jury. Our holding is consistent with Braham, which discourages the use of expert testimony on grooming except in certain limited circumstances. That is not to say that expert testimony may never be offered; there may be instances where expert testimony could be admissible and appropriate. Nor does our holding allow grooming evidence to be offered for any purpose; under Braham, grooming evidence may not be introduced as profiling evidence, or as circumstantial evidence of a defendant's guilt. Phelps fails to overcome the first hurdle to prevail on his PRP.
¶ 31 Even if we were to hold that the prosecutor argued facts not in evidence through his use of the term "grooming," Phelps cannot overcome the second hurdle of proving any misconduct was flagrant and ill intentioned. We have found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner. See State v . Monday, 171 Wash.2d 667, 257 P.3d 551 (2011) ; State v. Belgarde, 110 Wash.2d 504, 508, 755 P.2d 174 (1988) (holding a prosecutor committed flagrant and ill-intentioned misconduct by telling the jury the defendant in a murder trial was " 'strong' " with the American Indian Movement (AIM) and calling AIM a " 'deadly group of madmen' " and " 'butchers that kill indiscriminately' "); Glasmann, 175 Wash.2d at 701-02, 286 P.3d 673 (holding it was flagrant and ill-intentioned misconduct for a prosecutor *171 to present slides of the defendant's booking photograph with words like " 'GUILTY' " and " 'WHY SHOULD YOU BELIEVE ANYTHING HE *1150 SAYS ABOUT THE ASSAULT?' " superimposed over the photograph in bold red letters).
¶ 32 For example, in Monday, the prosecutor called attention to the fact that some of the witnesses were African-American by imitating their pronunciation of words during direct examination and arguing a " 'code' " that said " 'black folk don't testify against black folk' " explained why certain witnesses were reluctant to testify against the defendant. Monday, 171 Wash.2d at 674, 257 P.3d 551. The defendant appealed based on prosecutorial misconduct because the prosecutor had made an appeal to racial prejudice to undermine the credibility of witnesses based on their race. The State argued the evidence against the defendant was overwhelming. However, we reversed the defendant's conviction, holding the misconduct was flagrant and ill intentioned because "[t]he notion that [a prosecutor] should seek to achieve a conviction by resorting to racist arguments is so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should not need to be explained." Monday, 171 Wash.2d at 680, 257 P.3d 551. The cases establish in what settings misconduct amounts to inexcusable behavior that compromises the fairness of a defendant's trial.
¶ 33 Here, even assuming the prosecutor had committed misconduct, the misconduct did not cross the line into areas of conduct that would have threatened the fundamental fairness of his trial. The grooming comments did not rise to the level of being inflammatory, nor did they come close to the level of severity our precedent suggests is necessary to meet the "flagrant and ill intentioned" standard.
¶ 34 Also, in some cases we have factored in an inquiry whether a jury instruction could have cured the alleged misconduct. See Emery, 174 Wash.2d at 762-65, 278 P.3d 653 ; State v . Warren, 165 Wash.2d 17, 29-30, 195 P.3d 940 (2008). Here, Phelps has not shown any prejudice incurable by a jury *172 instruction. Closing arguments are not evidence, and the jury here was given an instruction to that effect. 8 VRP (Apr. 26, 2012) at 1476. Jurors are presumed to follow the court's instructions. State v. Hopson, 113 Wash.2d 273, 287, 778 P.2d 1014 (1989).
¶ 35 Finally, even if we were to find flagrant and ill-intentioned misconduct, Phelps does not overcome the third hurdle of actual and substantial prejudice required for him to prevail on his PRP. The Court of Appeals was concerned about the sufficiency of the evidence, but that is not the analysis we engage in to establish prejudice in the context of a PRP. Glasmann, 175 Wash.2d at 711, 286 P.3d 673 ("deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts"). The proper inquiry is whether there is a substantial likelihood the misconduct affected the jury's verdict. Glasmann, 175 Wash.2d at 711, 286 P.3d 673 (citing State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003) ).
¶ 36 Phelps does not point out where in closing argument the prosecutor's use of grooming affected the jury's determination of Phelps's guilt regarding the substantive crimes. As we have discussed, the prosecutor's use of the term "grooming" was similar to arguing Phelps had manipulated, controlled, or influenced A.A. Grooming was not central to proving the elements of the crime. Instead, the prosecutor used grooming to describe the context of Phelps's and A.A.'s relationship and how it evolved leading up to the incident.[8] Phelps does not establish actual and substantial prejudice as a result of the prosecutor's use of grooming in closing argument.
*173 ¶ 37 We reverse the Court of Appeals and dismiss Phelps's PRP.
WE CONCUR:
Owens, J.
Stephens, J.
González, J.
Gordon McCloud, J.
Yu, J.

The jury also found two aggravating factors: (1) Phelps knew or should have known that A.A., the minor victim, was a particularly vulnerable victim and (2) Phelps used a position of trust to facilitate commission of the crimes.

State v. Phelps, No. 43557-8-II (Wash. Ct. App. June 17, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/D24¨3557-8II¨¨0Unpublished0¨pinion.pdf. The issue of prosecutorial misconduct was raised and rejected by the Court of Appeals in this initial appeal. The State here does not argue that Phelps should be precluded from bringing this second prosecutorial misconduct claim in his PRP.

The State argues we should use the term "prosecutorial error" rather than "prosecutorial misconduct." Mot. for Discr. Review at 12-13. We decline to address this argument. "Prosecutorial misconduct" is a legal term of art, and we use it as such. Continuity of the use of this term is also necessary for research purposes in that a case search for "prosecutorial error" might not locate prosecutorial misconduct cases.

Defense counsel also referenced grooming several times in his closing argument, which somewhat weakens Phelps's claim that the prosecutor's use of grooming denied him a fair trial. See Russell, 125 Wash.2d at 89, 882 P.2d 747.

The value of A.A.'s father's comment that he believed Phelps had groomed her is debatable, but it is undisputed that that testimony was admitted.

While the State argued that Phelps "was grooming everybody else," 8 VRP (Apr. 26, 2012) at 1591, in context it was referring to Phelps's manipulation of the people surrounding A.A., not Phelps's grooming of other girls or propensity to groom. Propensity evidence is generally inadmissible under ER 404.

Because we hold the prosecutor did not commit misconduct, Phelps's ineffective assistance of counsel claims of both trial and appellate counsel necessarily fail.

The evidence of how the relationship developed and evolved tended to be more specific to the aggravating circumstances found by the jury of abuse of trust and particular vulnerability.