**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58942-7-II |
| Respondent, | |
| v. | |
| NATHAN SHAWN GREEN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—PB accused her roommate, Nathan Shawn Green, of raping her while she was under the influence of sedatives after dental surgery. DNA swabs of PB's underwear and vaginal area revealed the likely presence of Green's DNA. Green was charged with rape in the second degree. At trial, Green argued that PB had dreamed the sexual contact while under the influence of medication, and that his DNA was present due to innocent transfer incidental to sharing a home. A forensic expert for the State testified that DNA transfer was possible, but that she could not determine the likelihood that it was the reason Green's DNA was found on the swabs. The jury returned a guilty verdict.

Green appeals. He argues that the prosecutor committed misconduct during voir dire and closing argument, and that his attorney provided ineffective assistance of counsel when he failed to object to the prosecutor's closing arguments. He also appeals two conditions of community custody, arguing that they are unconstitutionally vague.

We affirm Green's conviction and the community custody condition requiring that he remain within a geographic area designated by the Department of Corrections. We accept the

State's concession and remand to the trial court to clarify the condition that Green disclose his

conviction to "future partners."

FACTS

I. BACKGROUND

Nathan Shawn Green and PB were friends and roommates who began living together in

2015. In 2018, PB had major dental surgery to remove teeth. Green drove her to and from the

appointment. PB was prescribed triazolam, a sedative, and took three of the pills as instructed

before the surgery. The pills affected PB's memory. After taking them, she remembered only

flashes, such as the dentist working in her mouth and removing her own sweatpants once she got

home. PB's flashes of memory included Green kneeling by her bed with several fingers inserted

in her vagina, and later Green with his mouth on her vagina.

Around 6:30 p.m. that evening, PB's boyfriend, Luis Rivera, arrived as planned to stay the

night and take care of PB. When Rivera arrived and knocked on the door, it took several minutes

for Green to let him in. When Rivera entered PB's room, he noticed wetness between her legs and

observed that her underwear was not pulled up beneath her pants. Rivera observed that the room

"[s]melled like sex." 2 Verbatim Rep. of Proc. (VRP) at 477. At this time, PB was not conscious

because of the medication, and when Rivera woke her, she remained disoriented and unable to

communicate clearly.

PB woke properly the following morning and told Rivera that she thought she had dreamed

that Green had put his mouth on her vagina while she was debilitated. Rivera relayed to PB what

he had observed the previous evening. PB went to the hospital and underwent a sexual assault

examination. PB's underwear and genital swabs were sent to a crime lab for testing. The following day, police arrested Green. The State charged Green with 1 count of rape in the second degree.

An analyst, Jeremy Sanderson, tested PB's underwear and found amylase, a chemical present in saliva. A swab from PB's underwear revealed two DNA profiles, one of which was PB's. Sanderson determined that it was 130 quintillion times more likely that the other contributor was Green than another random individual, "very strong support" for Green's DNA being present. 2 VRP at 555. Luis Rivera was excluded as a possible contributor.

A different analyst, Dana Yenko, performed a Y-chromosome short tandem repeat (Y-STR) DNA test on a perineal swab from PB. Yenko determined that the unidentified DNA from the swab matched Green's Y-STR profile, meaning that neither he nor any of his paternal male relatives could be excluded as contributors. Yenko calculated that this Y-STR profile would occur at most in one out of every 9,700 male individuals in the United States.

## II. VOIR DIRE

At voir dire, the prosecutor asked prospective jurors questions about their experiences with anesthesia and dental surgery.[1] She asked jurors to raise their hands if they had ever had their "wisdom teeth out or gone under for a surgery." 1 VRP at 276. The prosecutor followed up with some of the jurors who raised their hands, asking questions like, "How did that affect you?", "Did you drive yourself home after the surgery?", and "Could you have cooked for yourself that day?", eliciting a range of responses. 1 VRP 276-77. After hearing some of the prospective jurors' answers, the prosecutor then asked, "Would anyone not believe somebody who had a different reaction to like medication than you did?" 1 VRP at 279. She went on to ask the jurors whether

---

[1] Due to the Covid-19 pandemic, the trial did not occur until 2023.

they had "ever seen somebody who was so drunk or intoxicated that they couldn't function" and whether they would book a flight for somebody in that state if they asked. *Id.*

Defense counsel did not object to any of the prosecutor's questions. A short while later, Green's attorney returned to the subject of impairment from medication. He asked a juror whether they believed that medication could affect two people differently, including as it relates to their memory. He informed the jury pool that it was undisputed that the alleged victim in the case was under the influence of medication.

### III. TESTIMONY AND ARGUMENT

At trial, Green's theory of the case was that no rape ever occurred, and that PB had merely dreamed of sexual contact between Green and herself. Green's attorney argued that Green's DNA was present on the swabs tested by the lab because of innocuous DNA transfer resulting from incidental contact based on living together and sharing laundry machines.

During trial, Sanderson and Yenko testified about the tests they performed and the results as described above. Yenko also testified that DNA testing cannot reveal how DNA became present or how long it has been present. She further testified that it is possible for DNA to transfer in many ways, including through casual touch or saliva from close conversations. Yenko would not give a conclusion as to how likely it was that Green's DNA became present due to innocuous transfer, citing the many variables that impact how much DNA would transfer on contact. Sanderson and Yenko both testified that it was possible for DNA on clothing to remain after laundering. Sanderson indicated that it is "likely" that a washing machine would wash away DNA on clothing. 2 VRP at 526.

The trial court instructed the jury that "the lawyers' statements are not evidence. The evidence is the testimony and the exhibits." Clerk's Papers (CP) at 30. It further instructed, "You must disregard any remark, statement, or argument that is not supported by the evidence or the law." *Id.* The prosecutor reiterated that the attorneys' arguments are not evidence at the beginning of closing argument.

At closing, Green's attorney focused heavily on the DNA transfer theory. He told the jury, "If there was no such thing as DNA transfer, I guess the suggestion that DNA was transferred would be one of those fanciful beliefs that we talked about in jury selection . . . .[But] DNA transfer is real. It is part of the science." 2 VRP at 726. Concluding, he suggested that the jurors should feel confident in a verdict to acquit "because [they] required proof beyond a reasonable doubt. Not a fanciful doubt, but a doubt for which [they] could give a reason." 2 VRP at 731.

The State responded to Green's DNA transfer theory in rebuttal:

> [Defense counsel] also talked about the reasonable doubt standard and that . . . it can't be a fanciful doubt. . . . [B]ut the State would argue that what is fanciful doubt is the arguments about the DNA and how Mr. Green's spit going onto [PB's] face, she touched her face, rubbed it all over her vagina and her underwear and that's how his DNA got there. . . . You heard the testimony of the DNA experts. They said, yeah, that's possible. But Ms. Yenko kept saying it depends . . . on a bunch of factors.

2 VRP at 737. The prosecutor went on to list several of the factors that Yenko had described as affecting DNA transfer before dismissing Green's theory as implausible:

> It depends on . . . if you're . . . a big DNA shedder. It depends on length of contact. Depends on if your hands are sweaty. . . . She said that fluids tend to contain more DNA. . . . It depends. But that doesn't mean that DNA evidence is meaningless. But that's what that would mean, is that every single incidental touching would result in DNA showing up on someone's underwear and on their vagina, on the outside of their vagina and the perineal swabs, then DNA is meaningless. . . . If [defense counsel's] analogy is correct that everyone is just shedding DNA everywhere and, you know, it could get all over your body . . . then wouldn't that

also mean that Mr. Rivera's DNA should have been found? Mr. Rivera was dating [PB]. . . . Mr. Rivera was excluded.

2 VRP at 737-39.

The prosecutor continued to argue that the DNA transfer theory was unreasonable, eventually stating:

> So the fanciful doubt would be this idea that . . . talking to somebody and their spittle going on their face and that gets in under your clothing on your underwear, that doesn't make any sense. That's just not reasonable. . . . When you have all this evidence that shows that it was raining outside, . . . if somebody tried to claim that aliens came and dumped water from the sky or somebody is outside hosing everybody down, is that reasonable?

2 VRP at 739-40. Green's attorney did not object to any part of the prosecution's rebuttal argument.

The jury convicted Green of rape in the second degree. Green's judgment and sentence included several conditions of community custody, including a mandatory condition to "[r]emain within geographic boundary, as set forth in writing by the Community Corrections Officer" and a condition to "[d]isclose crime of conviction to future partners." CP at 71.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Green argues that the prosecutor committed reversible misconduct based on comments made during closing arguments and questions during voir dire. We disagree.

A.     <u>Closing Argument</u>

"[T]o prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Prosecutors have "reasonable latitude" to draw inferences from the record, and even

6

improper remarks "are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to [defense counsel's] acts and statements." *State v. Graham*, 59 Wn. App. 418, 428-29, 798 P.2d 314 (1990).

When a defendant failed to object at trial, any error is waived unless they can show "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704. The Washington Supreme Court has "found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases," for example, "comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018). Because the primary concern is "about the jury drawing improper inferences from the evidence," *id.*, we "should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured" by proper jury instruction. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). We presume that jurors follow the court's instructions. *Phelps*, 190 Wn.2d at 172.

Because Green's attorney did not object to the prosecutor's comments at trial, Green must show that the comments were so flagrant and ill intentioned that a jury instruction would not have cured the issue. Here, the trial court gave an instruction reminding jurors that the evidence is the witness testimony and exhibits, not the lawyers' statements, and that they should disregard any argument unsupported by the evidence. The prosecutor reminded the jury of this instruction at the beginning of her closing argument. We assume that the jury followed the court's instructions and disregarded any of the prosecutor's comments that may have been inconsistent with the testimony. Additionally, the prosecutor's comments here were not the type of comments our courts have

generally found to be flagrant and ill intentioned: they were not racially charged, focused on the defendant's membership in a particular group, or otherwise inflammatory. *See id.* at 170-71. The prosecutor also did not use vouching language expressing a personal belief that witnesses were credible or not credible, for example.

Green argues that the prosecutor's misconduct here was not curable because DNA has a "unique potential to be misunderstood by juries." Br. of Appellant at 31. Green cites several out-of-state cases in which courts held that prosecutors who misrepresented DNA evidence had committed reversible misconduct.

For instance, in *Whack v. State*, the court reversed the defendant's conviction based on a prosecutor's statement in closing argument that equated two vastly different DNA figures. 433 Md. 728, 73 A.3d 186, 195, 202 (2013). One DNA profile at the scene of the crime was consistent with the victim, with the odds of a randomly selected individual being the contributor instead being 1 in 212 trillion. *Id.* at 196. Whack could not be excluded from the other profile, with the odds of a randomly selected individual being the contributor instead being 1 in 172. *Id.* At closing argument, the prosecutor stated that "this 172 is no less strong than that 212," omitting the "trillion" from the second figure. *Id.* at 194. And in *People v. Rozier*, the court reversed the defendant's conviction after the prosecutor characterized an expert's contention that the "defendant was among 1 in 15 Americans who could not be excluded as a contributor" to be "'overwhelming' proof establishing defendant's 'guilt beyond all doubt.'" 143 A.D.3d 1258, 39 N.Y.S.3d 340, 342 (2016).

In these cases, the prosecutors incorrectly described the likelihood that the defendants were or were not contributors to DNA profiles, mischaracterizing factual testimony about concrete DNA statistics. Here, the prosecutor reiterated that the expert had said DNA transfer was possible and

outlined several factors that might influence such transfer before appealing to the jurors' common sense to argue that transfer was not reasonably likely in Green's situation. Any departure from the experts' testimony was not so extreme that a jury instruction would not have cured the issue. We therefore hold that none of the prosecutor's statements at closing argument was misconduct warranting reversal.

B.      Voir Dire

Green also argues that it was improper for the prosecutor to ask prospective jurors about their own experiences being anesthetized or having dental surgery, characterizing this line of questioning as akin to "[i]nviting the jury to envision themselves in the victim's place [in] an improper appeal to sympathy."[2] Br. of Appellant at 35. Because Green's attorney failed to object to these questions, Green must again show that they were so flagrant and ill intentioned that a jury instruction would not have cured the issue. *Emery*, 174 Wn.2d at 760-61.

"A voir dire examination shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges." CrR 6.4(b). Asking jurors about their experience with anesthesia in a case that involved sedation, as the prosecutor did here, was relevant to determining whether jurors could be impartial and whether a peremptory or for cause challenge was appropriate, for example, because a prospective juror could not recognize that people's reactions to sedatives and anesthesia might differ. This type of questioning bears little similarity to inflammatory comments that courts

---

[2] In passing, Green argues that when the prosecutor discussed PB's incapacitation during closing arguments, it "call[ed] to mind the same personal experiences that were brought up during voir dire." Br. of Appellant at 40. However, because the claim in the assignment of error is only that the prosecutor committed misconduct in this regard during jury selection, we need not discuss this portion of closing further.

have historically found to be incurable. *See Phelps*, 190 Wn.2d at 170-71. Therefore, the prosecutor's questions were not flagrant and ill intentioned, and Green waived this challenge by failing to object below.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Green argues next that his trial counsel provided ineffective assistance when he failed to object to the prosecutor's remarks during closing arguments. To win an ineffective assistance of counsel claim, a defendant "must show that counsel's performance was objectively deficient and resulted in prejudice." *Emery*, 174 Wn.2d at 755. "Courts strongly presume that counsel's representation was effective." *Id.*

To prove prejudice, the defendant must affirmatively show "a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). The reasonable probability standard requires less than a preponderance of evidence but more than merely "a 'conceivable effect on the outcome.'" *Id.* at 458 (internal quotation marks omitted) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)). "If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then 'the defendant must show that the objection would likely have succeeded.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). Failure to object to comments made in closing arguments is unlikely to be prejudicial when the jury was instructed to "disregard any remark or argument made by either counsel that was not supported by the evidence or the law." *State v. Putman*, 65 Wn. App. 606, 611, 829 P.2d 787 (1992).

Green was not prejudiced by counsel's failure to object for the same reason that the prosecutor's misconduct was not so flagrant as to require reversal: the jury was instructed to disregard any statements made by attorneys that were not supported by the evidence. The comments that Green finds objectionable occurred after the prosecutor recited what the experts had said about DNA transfer with general accuracy, and unlike in some of the cases Green cites, the State did not mischaracterize the experts' testimony or conclusions. Under these circumstances, there is not a reasonable probability that the outcome would have been different had counsel objected. Therefore, Green's ineffective assistance claim fails.

### III. CONSTITUTIONALITY OF CONDITIONS OF COMMUNITY CUSTODY

Finally, Green challenges two conditions of community custody as unconstitutionally vague: the condition that Green must "'[r]emain within geographic boundary, as set forth in writing by the Community Corrections Officer'"; and the condition that he must disclose his crime "'to future partners.'" Br. of Appellant at 45-46 (quoting record). The State concedes that the "future partners" condition is open to interpretation and we should remand for clarification.

"The Fourteenth Amendment to the United States Constitution along with article I, section 3 of the Washington State Constitution require that citizens be afforded fair warning of proscribed conduct." *State v. Nguyen*, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). "[A] community custody condition is unconstitutionally vague if it '(1) . . . does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) . . . does not provide ascertainable standards of guilt to protect against arbitrary enforcement.'" *Id.* (alterations in original) (quoting *State v. Bahl*, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008)).

A.      <u>Geographic Boundaries</u>

Green first challenges the community custody condition that he must "'[r]emain within geographic boundary'" set forth in writing by the Department of Corrections. Br. of Appellant at 45 (quoting record). He contends that this condition is unconstitutionally vague. We disagree.

Here, the trial court did not impose a specific geographic boundary. Instead, it clearly and unambiguously required Green to comply with a boundary to be set by the Department. Under RCW 9.94A.703(1)(b), the sentencing court must require the defendant "to comply with any conditions imposed by the [D]epartment under RCW 9.94A.704." And the legislature *requires* the Department to set geographic restrictions for individuals it supervises based on an assessment of the individual's risk to community safety. RCW 9.94A.704(2)(a), (3)(b). Thus, given that the legislature granted the Department the authority to impose these geographic boundaries and provided guidelines for deciding how to impose them, the trial court did not improperly give the Department an unfettered power of interpretation. *See State v. Lundstrom*, __ Wn. App. 2d __, 572 P.3d 1243, 1245-46 (2025). Additionally, this community custody condition contemplates that the defendant will have sufficient notice of what the geographic boundaries are, and this clarity also protects against arbitrary enforcement. Accordingly, the condition is not unconstitutionally vague.

B.      <u>Future Partners</u>

Green next challenges the community custody condition that requires him to "'[d]isclose [his] crime of conviction to future partners.'" Br. of Appellant at 45-46 (quoting record). He contends that the term "future partners" is unconstitutionally vague. The State concedes that "future partners" is potentially vague and "could be interpreted in several different ways." Br. of Resp't at 56.

No. 58942-7-II

The Washington Supreme Court has held that the term "dating relationship" is not unconstitutionally vague. *Nguyen*, 191 Wn.2d at 683. By contrast, the similar term "romantic relationships" has been deemed unconstitutionally vague. *State v. Peters*, 10 Wn. App. 2d 574, 591, 455 P.3d 141 (2019). Here, the State asks us to remand so that the trial court can rewrite this condition to use the "dating relationship" language that has been held to be constitutional. We accept the State's concession and remand as requested.

CONCLUSION

We affirm Green's conviction and the community custody condition about geographic boundaries, but we remand for clarification of the community custody condition requiring Green to give notice of his crime to "future partners."

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, C.J.

CHE, J.