IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37150-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHAEL NACHO MARTINEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Michael Martinez appeals after a jury found him guilty of four counts of child molestation—one count involving one accuser and the other three involving a second accuser. One of his most convincing arguments is that he received ineffective assistance of counsel when defense counsel failed to renew his denied pretrial motion to sever charges. Had the motion been granted, there would have been two trials, one for each accuser.

CrR 4.4(a)(2) requires counsel to renew a denied pretrial motion to sever before or at the close of all the evidence. Failure to renew a denied pretrial motion to sever results in waiver of any claimed error with respect to that motion.

Based on the record, we are unable to determine whether defense counsel's failure to renew the denied motion was a reasonable strategic decision. Martinez must seek relief through a personal restraint petition.

But we agree the prosecutor committed misconduct by mischaracterizing one of the accuser's testimony and there is a substantial likelihood that this misconduct resulted in the jury finding the presence of the "ongoing pattern of sexual abuse" aggravator with respect to counts 3 and 4. We remand for the trial court to vacate those two findings and for resentencing. We otherwise affirm his convictions.

FACTS

Michael Martinez was born in 1991. He and his family lived in a small 600 square foot, two-bedroom house. His family consisted of his mother, Dana, his father, Mario, and his sister, Lilyanna.[1] Martinez slept in the living room until around 2006, when he moved into a trailer in the backyard.

The Martinez family sometimes hosted gatherings where cousins and friends spent the night in their home. Those overnight guests included H.C. and P.R., Martinez's accusers.

---

[1] Because multiple witnesses share the surname Martinez, we refer to those witnesses by their first names. We mean no disrespect.

H.C. is Martinez's cousin and was born in 2000.  P.R. is the daughter of Dana's best friend, Wonvisa Ramirez, and was born in 2004.

In December 2017, H.C. told her mother, Cristina, that Martinez touched her when she was younger.  She said it happened when she spent the night at the Martinez house.  Cristina then told Ms. Ramirez, P.R.'s mother, about H.C.'s allegations.  When Ms. Ramirez asked P.R. if anything happened to her, P.R. started crying.  At that point, law enforcement began its investigation.

Based on H.C.'s accusations of abuse from February 2008 to December 2011, the State charged Martinez with one count of first degree rape of a child (count 1) and one count of first degree child molestation (count 2).  Based on P.R.'s accusations of abuse from June 2010 to December 2015, and also on January 1, 2017, the State charged Martinez with two counts of first degree child molestation (counts 3 and 4) and one count of second degree child molestation (count 5).  The State also alleged the "ongoing pattern of sexual abuse" aggravator with respect to each count except count 5.

Martinez pleaded not guilty to all counts.  Three months prior to trial, he moved to sever the charges involving H.C. from the charges involving P.R.

*Motion to Sever*

At the severance motion hearing, Martinez argued that a trial on five counts involving two alleged victims would cause the jury to cumulate evidence and infer guilt in one case based on evidence from the other. The State disagreed, arguing any prejudice could be mitigated by a limiting instruction.

The court analyzed the four severance factors and denied the motion. For the first factor—the strength of the State's evidence on each count—the court stated:

> I also note that in the SIR[2] that . . . [Cristina] reported that she had learned that Michael had admitted to abusing H.C. and another female cousin. So there's some strength there as well if that actually comes into evidence.
> . . . [I]f in fact that admission does come into evidence—state's case would be fairly strong at least as to [H.C.]. And then [H.C.] bolsters the other case in her testimony [because she told an officer she saw Martinez abuse P.R. once]. So I think the state's evidence is fairly strong on these cases.

Report of Proceedings (RP) (May 15, 2019) at 12.

For the second factor—the clarity of the defenses—the court found little likelihood of confusion because Martinez denied everything.

---

² The first document filed by the State in a criminal prosecution is an abbreviated narrative prepared by law enforcement and signed under oath. The narrative supports probable cause, which must be determined at the initial preliminary hearing. The narrative, known as a "Suspect Identification Report," is colloquially shortened to SIR.

4

For the third factor—court instructions to the jury to consider each count separately—the court noted: "[J]uries—are willing to and capable of following that instruction and in fact by law are presumed to follow the court's instructions." RP (May 15, 2019) at 13.

For the fourth factor—cross-admissibility of evidence—the court stated: "[T]his is the one that gives me the most pause, given the—the time frame of these occurrences." RP (May 15, 2019) at 13. But it concluded the overlap in time between both victims' allegations make it mostly "an ongoing thing." RP (May 15, 2019) at 14. The court rejected Martinez's argument that the evidence would be inadmissible under ER 404(b):

> [T]he court could allow in these cases evidence of prior molestations or rapes of children under a common scheme or pattern or plan with designing to molest young children due to the marked similarities of the events.
>      Part of the marked similarity of these events are the location, the relationship of the children to—to either—by—blood or by friendship, these are children of either a friend of the mother's of the defendant or either a relative of the mother's, I believe, and that's how they ended up in that household at the time of the events.
>      So, the cross-admissibility is the most bothersome to me, because it does lead the court to consider that there may be an inference of guilt.
>      But when I weigh the inherent prejudice of that to the defendant against the important consideration of judicial economy—And I note that the cross-admissibility of evidence is not . . . an entirely exclusionary factor under the case law, but just one of the factors to consider—I believe that the consideration of judicial economy . . . overrides the inherent prejudice that occurs, that can be overcome by proper instructions to the jury. . . .

RP (May 15, 2019) at 14-15.

5

The court concluded: "I don't believe that the defense has raised the manifest prejudice that's necessary under the circumstances sufficient to outweigh the concern for judicial economy and I'll deny the motion at this time." RP (May 15, 2019) at 16. The court said it expected defense counsel to renew the motion at trial.

*Trial*

*State's Witnesses*

*H.C.'s Testimony*

H.C. testified that her extended family was "always together" for dinners, holidays, and birthdays. RP at 291.[3] H.C. slept over at Martinez's house "[a]ll the time" because she was close to Lilyanna, Martinez's sister. RP at 293. She always slept with Lilyanna, usually in her bedroom. Three children often slept in one bed.

H.C. said the first time Martinez touched her, she was around eight years old. She was sleeping with her sister and Lilyanna, who is about three years older than she is. Martinez came into Lilyanna's bedroom and put his fingers inside of H.C.'s vagina. When H.C.'s sister woke up and asked what was happening, H.C. made up a lie. Martinez left after H.C.'s sister went back to sleep.

---

[3] "RP" references are to the verbatim report of proceedings of the trial unless otherwise indicated.

H.C. said the next time it happened was in the Martinez living room. They set up blankets and pillows on the floor to sleep on. Martinez laid next to H.C. and put his hands on her vagina. She could not remember how old she was or how much time had elapsed between the first incident and the second.

H.C. testified that it happened again on Lilyanna's 15th birthday. This time, Martinez placed H.C. on top of him while he was sitting on the couch. She said they were both facing the ceiling but she could feel his body behind her and remembered feeling "something wet" below her waist. RP at 300. She later testified that she remembered "seeing white stuff." RP at 331.

When the prosecutor asked H.C. to talk about another time Martinez touched her, she said: "He just touched me in the living room. It's like what I'm telling you he did every single time. He always touched me when I was sleeping, when it was nighttime, like it's all the same." RP at 302. She continued: "When he moved to the trailer, he still found himself a way inside the house touching me." RP at 303. When the State asked how many times Martinez touched her, H.C. responded, "Probably like 10 or more," and "mostly every time I spent the night." RP at 303, 298. She kept thinking it would stop, but "[h]e kept doing it every time I went back," either in Lilyanna's room or the living room. RP at 298. She said it stopped when she was 12 or 13 years old.

H.C. testified that one year or two after Martinez stopped touching her, she saw

him come into the living room where the children were sleeping and touch P.R.  H.C. said

P.R. did not open her eyes but was "moving as if having a bad dream or something."

RP at 305.  Martinez laid next to P.R. in the same way he laid next to H.C.  H.C. thought

Martinez's hands were in P.R.'s pants under the blanket.

The prosecutor asked again if H.C. could remember any more specific instances of

touching.  H.C. responded: "No.  Honestly, it's all the same.  He touched me the same

every single time . . . besides the couch thing . . . it was always at night when everyone

was sleeping."  RP at 310.

On cross-examination, H.C. testified that she stayed at the Martinez home between

20 and 50 times from when she was 8 to 12 years old.  She said Martinez abused her each

of those 20 to 50 times.

### P.R.'s Testimony

P.R. testified that Martinez started touching her when she was five or six years old.

She could "remember a few times that it happened," but did not know exactly when it

happened first, other than it was the summer after first grade.  RP at 356.  She was in

Lilyanna's room at night, while her mother and brothers were awake in the living room.

8

Martinez leaned over her and put his hand on her vagina. P.R. felt the left side of his body on her right shoulder.

P.R. remembered a time Martinez touched her during the day. She was sitting on the couch while everyone else was in the kitchen. Martinez put his hand on her vagina over her clothes. P.R. tried moving off of the couch. She thought this happened after the incident at night. The following exchange took place:

> [THE STATE:] Do you recall any other times Mr. Martinez touched you between those two incidents?
> [P.R.:] No.
> [THE STATE:] Do you recall about how many times Mr. Martinez—
> [P.R.:] All I can remember is three times.
> [THE STATE:] Did Mr. Martinez only touch you three times or did—
> [P.R.:] I can only recall—
> [THE STATE:] Did he touch you more than three times?
>     [THE DEFENSE]: Objection. It's been answered.
>     THE COURT: The objection is it's been asked and answered?
>     [THE DEFENSE]: Yes, your Honor.
>     THE COURT: Overruled.

RP at 360.

The State then asked about the third incident P.R. could recall. P.R. said it happened on New Year's Eve in 2015 or 2016. Several people were drinking at the house Martinez and his girlfriend, Gloria Campos, shared. Martinez set up an air mattress in his

9

living room for P.R. and her brothers to sleep on. Lilyanna and her boyfriend slept on the couch in the living room. P.R. said she woke up to Martinez grabbing her breast over her shirt.

The State again asked if P.R. could "estimate how many times he touched you?" RP at 364. The court sustained Martinez's asked-and-answered objection.

*Defense*

*Gloria Campos's Testimony*

Ms. Campos testified that Martinez has been her boyfriend since 2012 and is the father of their three children. She testified that P.R. had spent the night twice in the house she shares with Martinez, once on New Year's Eve.

On that night, everyone went to bed around 1:00 a.m. P.R. and her brothers shared an air mattress in the living room. Ms. Campos and Martinez slept in their bedroom with their two young children. Ms. Campos said Martinez did not molest P.R. that night; she would have woken up if he had gotten out of bed because she is a light sleeper.

*Martinez's Testimony*

Martinez testified that Gloria Campos has been his girlfriend since the summer of 2012. They spent every night together—either in the trailer or at Ms. Campos's house. In

2013, he permanently moved into Ms. Campos's house. He denied he did any of the things H.C. or P.R. described.

*Lilyanna's Testimony*

Martinez's sister, Lilyanna, testified that H.C. attended birthday parties and barbeques at the Martinez's home. She said H.C. spent the night "[p]robably once or twice" and would always sleep with her in her bed or in the living room. RP at 590. Lilyanna said H.C. was never alone in their house. She said if Martinez entered the house from where he slept in the trailer, he would have to go through the heavy back door, which closed loudly. The hinges squeaked and the doorknob would have to be jiggled.

Lilyanna's bedroom door also squeaked, and she kept her door mostly shut at night. The living room floor squeaked when stepped on in certain places. Their small house had thin walls, and Lilyanna is a light sleeper so she could hear everything. Lilyanna would have woken up if Martinez had entered her bedroom during the night.

Lilyanna testified that P.R. "basically lived" at the Martinez house at one point. RP at 605. P.R. and her younger brother slept with her in her bedroom. P.R. always slept by the wall because she would fall off the bed. Lilyanna said P.R. was never alone because there were always so many people around the house. Lilyanna never saw Martinez molest P.R.

11

When Lilyanna learned of the allegations against her brother, she spoke with him and their mother. Martinez told Lilyanna about the allegations but said nothing else. Lilyanna talked to H.C.'s mother, Cristina, but did not discuss her conversation with Martinez. She said she never told Cristina that Martinez admitted anything.

*Dana's Testimony*

Martinez's mother, Dana, testified that H.C. visited her home under 10 times when H.C. was between 8 and 12 years old. H.C. spent the night two times and slept with Lilyanna in her bedroom.

Dana testified that P.R. frequently spent the night at her house and was like a daughter to her. P.R. was never alone in the house because there were so many people around.

Lilyanna is older than H.C. and P.R. When either girl spent the night, Lilyanna always slept on the outside of the bed so the younger girl would not fall off.

Dana is a light sleeper and would check on the children throughout the night. She slept with her bedroom door open. The family's dogs barked at everyone, including Dana and Martinez. She would have woken up if anyone, including Martinez, entered the house at night. Dana reiterated that neither P.R. nor H.C. was ever alone in her house.

Dana learned of the allegations against Martinez from Cristina, H.C.'s mother. Dana told Martinez what Cristina told her the next morning. A few days later, Dana and Lilyanna went to Cristina's house. They did not discuss Martinez, but instead discussed Cristina's son. Dana said neither she nor Lilyanna said anything about Martinez admitting the allegations.

After this testimony, the defense rested. Over the defense's objection, the State recalled Cristina to the stand for rebuttal.

### State's Rebuttal

#### Cristina Martinez's Rebuttal Testimony

Cristina testified that she, Lilyanna, and Dana discussed the allegations against Martinez in December 2017. Lilyanna came to Cristina's house to talk, and Dana arrived shortly thereafter. They had a conversation outside, where Lilyanna said she had spoken with Martinez. The prosecutor asked, "Did you come to an understanding whether or not Michael admitted the allegations?" RP at 710. The defense objected based on hearsay, which the court sustained. The court sent the jury out so the issue could be discussed further.

The State argued the question went to impeachment because Lilyanna denied talking about the allegations. The court asked whether ER 613(b), prior inconsistent

13

statement of a witness, applied.  The State said yes.  The defense agreed this was proper

impeachment testimony and requested a limiting instruction:

> [T]hat it is not substantive evidence and that the jury may consider it only
> for the purpose of deciding whether Lilyanna Martinez and Dana Martinez
> were credible on the matter asserted, namely . . . whether they made
> statements that my client, Mr. Martinez, ever made any admissions of guilt
> with respect to these charges.

RP at 712.  The court asked whether the limiting instruction would be written or oral, and

the defense said, "[I]t's an oral instruction for the court to give now in respect to the

testimony."  RP at 713.

The trial court then brought the jury back in and instructed: "You may not consider

the evidence in the form of testimony for any other purpose other than for the purpose of

impeachment of Ms. Lilyanna Martinez and Dana Martinez.  It is not to be considered by

you as substantive evidence."  RP at 714.

The State asked what understanding Dana, Lilyanna, and Cristina had come to

after the conversation at Cristina's house.  Cristina answered:

> She told me just what—that he admitted to it.  Then they said that he was
> hurt, too, as a young boy by a woman.  I asked, who was it?  . . .  She said, it
> doesn't matter.  Even though it was a woman, it's the same effect that the
> girls felt.

RP at 715.

The State then asked if Cristina talked to Martinez about the allegations. Cristina answered: "No, but he texted me. He wanted to speak." RP at 716. The State's exhibit 55—the text message from Martinez—was then marked. The message read:

> Hey auntie do you think i could talk to you. I've be giving you guys space because i wasent sure if you guys wanted to talk yet, but i would really like to talk to you if u would let me and it doesn't have to be alone if u don't want. Its just going to be me no-one knows im texting you right now except for gloria. Ive wanted to talk from the beginning but it sound like nobody wanted to or was ready. I love you guys ive always have and i would really like to talk to someone.

Ex. 55. The defense objected five times to the exhibit's admission for lack of foundation. Cristina said she had received it after talking with Lilyanna and Dana, it came from Martinez's phone, she e-mailed a copy of it to the police, and she did not respond to Martinez.

The State rested. The defense renewed its motion to dismiss, which the court denied. The defense recalled Martinez to ask him about exhibit 55. He testified: "It's a text message. I was trying to reach out to my aunt so I could talk about this incident and clear it up." RP at 739.

*State's Closing Argument*

The prosecutor argued H.C. "talked about [the touching] happening almost every time she spent the night at her cousin's . . . about 20 to 50 times." RP at 758. "It was constantly the same type of abuse that she was subjected to by the defendant." RP at 760.

The prosecutor then argued, "[P.R.] knew it started before this first time that she could remember." RP at 760-61. And "she talked about how this was going on all the time. We heard testimony she was spending [the] night at this residence quite frequently. She was there all the time." RP at 762. Defense counsel did not object to these statements.

The prosecutor then discussed the charged aggravator:

> [THE STATE]: We also heard evidence that this happened not just once, not just twice, not just three times, but this happened all the time, 20 to 50 times for [H.C.], just as many for [P.R.].
> > [THE DEFENSE]: Objection, assumes facts not in evidence.
> > THE COURT: Overruled. The jury will rely on their
> recollection of the testimony.

RP at 766.

*Jury Deliberations, Verdict, and Sentencing*

During deliberations, the jury sent out a written note: "Jury requests further explanation of the impeachment of Dana Martinez and Lilyanna Martinez including the ruling regarding submission of State's Evidence #55." Clerk's Papers (CP) at 25. The

16

defense told the court this seemed like two separate issues and the jury was confused, but stated, "I don't know that we can give much of an answer other than reread your instructions or reread Instruction No. 1." RP at 792. The State agreed. The court suggested writing an answer to that effect, and the defense said, "Yeah. I'm afraid it won't be satisfactory to them. I don't know what else we can do." RP at 793. The court responded: "Please refer to your jury instructions and in particular reread Instruction No. 1." CP at 25. Instruction 1 was the lengthy standard instruction to jurors informing them of their general duties.

The jury acquitted Martinez of rape of a child in the first degree, but found him guilty of all four counts of child molestation. In addition, it found that the State had proved the "ongoing pattern of sexual abuse" aggravator with respect to each of the four molestation counts. Because the State had not charged the aggravator in conjunction with the second degree molestation count, the court later vacated that aggravator finding. The court imposed a sentence of 209 months to life. Martinez appealed.

## ANALYSIS

Martinez raises four general arguments on appeal: error in not severing the charges, ineffective assistance of counsel, prosecutorial misconduct, and cumulative error. We address each in the order raised.

17

1.      SEVERANCE OF CHARGES

Martinez contends the trial court abused its discretion in denying his motion to sever the charges involving H.C. from the charges involving P.R. The State argues Martinez failed to preserve this issue for appeal. We agree with the State.

Although Washington courts often consider severance and joinder together, their distinctions are relevant here. Joinder permits two or more offenses to be charged together, with each offense as a separate count, when they are "of the same or similar character, even if not part of a single scheme or plan." CrR 4.3(a)(1). Properly joined offenses "shall be consolidated for trial unless the court orders severance . . . ." CrR 4.3.1(a).

"'Severance' refers to dividing joined offenses into separate charging documents." *State v. Bluford*, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017). A court grants severance when doing so "will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). In general, a defendant must move for severance pretrial. CrR 4.4(a)(1). If the pretrial motion is denied, the defendant must renew the motion before or at the close of evidence to preserve the issue for appeal. CrR 4.4(a)(2). "If the party does not timely make or renew a severance motion, '[s]everance is waived.'" *Bluford*, 188 Wn.2d at 306 (alteration in original) (quoting CrR 4.4(a)(1), (2)). The

purpose behind the rule is to permit the trial court to exercise its discretion when it has a comprehensive understanding of the facts so it can best weigh the potential prejudice of having similar counts joined together in one trial.

*Waiver*

As a preliminary matter, we must determine whether Martinez preserved this claim of error. Martinez moved to sever the charges before trial. The court denied the motion but expected him to renew it at the close of evidence, which he did not. The State points to the plain language of the rule: "Severance is waived by failure to renew the motion." CrR 4.4(a)(2).

Martinez responds that his pretrial motion to sever was also an objection to joinder, which need not be renewed for appeal. *See State v. Bryant*, 89 Wn. App. 857, 865-66, 950 P.2d 1004 (1998). We disagree. The State filed a single charging document for all counts and therefore did not move for joinder. The severance rules control here. *See Bluford*, 188 Wn.2d at 310 ("[W]here multiple charges are originally brought in a single charging document, the State has no need to bring a joinder motion to the court. In that situation, the severance rules . . . are the only means by which a defendant can secure separate trials on the charged offenses."). By the clear language of CrR 4.4(a)(2), Martinez waived this claim of error.

Martinez argues his counsel was ineffective for failing to renew his severance

motion. We now analyze his severance argument through the lens of an ineffective

assistance of counsel standard.

*Ineffective Assistance of Counsel*

Martinez contends his counsel's failure to renew the severance motion at the close

of evidence constitutes ineffective assistance. For purposes of direct review, we disagree.

A defendant claiming ineffective assistance of counsel must show: (1) counsel's

performance fell below an objective standard of reasonableness, and (2) the deficient

performance prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899

P.2d 1251 (1995) (applying the two pronged test from *Strickland v. Washington*, 466 U.S.

668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Where a defendant fails to establish

the first prong of ineffective assistance of counsel, we need not address the second prong.

*In re Pers. Restraint of Crace*, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012); *State v.*

*Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996) ("If either part of the test is not

satisfied, the inquiry need go no further.").

*Defense Counsel's Reasonableness*

We presume counsel's performance was effective, and Martinez bears the burden

to prove otherwise. *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541, *review denied*,

193 Wn.2d 1038, 449 P.3d 664 (2019). In doing so, he "must show there was no legitimate strategic or tactical reason for counsel's action." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Martinez argues his trial counsel had no strategic reason not to "perform what amounted to the ministerial task of renewing the motion." Appellant's Am. Br. at 36. He argues that the evidence pertaining to each victim was weak, and the State likely could not have obtained convictions without having both victims bolster each other's claims in a single trial.

His argument is fairly strong. With one possible exception, neither accuser produced a witness to any of the 20 to 50 instances of alleged abuse that occurred in a very small house with several people around. Also, there was no physical evidence, and H.C. did not accuse Martinez until years after the alleged events. The accusations made by P.R. had similar infirmities. Although she testified she was abused on just three occasions, it is difficult to understand how Martinez could have molested her even three times without detection. Perhaps the only way a jury could have found Martinez guilty of any of the counts was for each accuser's accusations to bolster the other's accusations.

But there may have been a legitimate strategic reason not to renew the severance motion. For instance, H.C. testified that Martinez molested her basically every night she

21

stayed at the Martinez home.  Yet, defense counsel did an excellent job establishing how unlikely this was, given the extremely small house, the sleeping arrangements with the young accusers closest to the bedroom wall, and the unlikeliness that Martinez could molest the two accusers so many times without others knowing.  Defense counsel may have reasonably concluded that winning one trial was easier than winning two trials.

From this record, we cannot decide whether defense counsel's failure to renew the motion to sever was a reasonable strategic decision.  Martinez's ineffective assistance of counsel claim cannot be decided on direct appeal because his argument depends on evidence outside of this record.  He must seek relief through a personal restraint petition. *McFarland*, 127 Wn.2d at 335.  Because Martinez has failed to establish the first prong of his ineffective assistance claim, we need not analyze the second prong, prejudice.

2.      OTHER INEFFECTIVE ASSISTANCE

Martinez contends his trial counsel was ineffective for failing to properly object to exhibit 55 and failing to request a written limiting instruction.  We address each issue in turn.

As stated above, to prevail on his ineffective assistance of counsel claim, Martinez must show both that his counsel's performance was deficient and that deficiency

prejudiced his case. *Id.* at 334-35. We presume counsel's performance was effective, and Martinez bears the burden to prove otherwise. *Crow*, 8 Wn. App. 2d at 507.

*Exhibit 55*

Martinez first argues his counsel was deficient for failing to properly object to exhibit 55, the text message he sent to his aunt Cristina, on the grounds that a proper foundation had not been laid. He contends the court would have excluded the message if counsel had objected on grounds of relevancy. We disagree.

"To prove that failure to object rendered counsel ineffective, [defendant] must show that not objecting fell below prevailing professional norms, that the proposed objection would likely have been sustained, and that the result of the trial would have been different if the evidence had not been admitted." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (footnotes omitted).

The exhibit was admitted after Cristina testified that Lilyanna and Dana told her Martinez admitted to the abuse. When asked whether she had spoken with Martinez about the allegations, Cristina said: "No, but he texted me." RP at 716. Defense counsel objected to the admission many times for lack of foundation, and the court required proper authentication before allowing the message into evidence.

23

The text message arguably was relevant to show that Martinez knew that his sister and mother had recently met with his aunt to discuss the molestation accusations. Although the record is unclear, the message may have been sent soon after the three women met. If so, Martinez fails to convince us that a "relevancy" objection would have been sustained.

On the other hand, if the State failed to establish that the text message was sent soon after the three women met, a relevancy objection may have been sustained. The message itself was innocuous, it merely showed that Martinez wished to clear himself of the accusations. In fact, that is what Martinez testified to after his aunt testified. If the State failed to establish a nexus between the text message and the meeting of the three women, no prejudice could have resulted from defense counsel's failure to object on grounds of relevancy.

*Limiting Instruction*

Martinez next argues his trial counsel was ineffective for not requesting a written limiting instruction to help the jury understand the limited purpose for which the court admitted Cristina's ER 613(b) testimony. Martinez argues a written limiting instruction should have been requested either before jury deliberations or after the jury expressed

24

confusion during its deliberations about the court's oral instruction and also about

exhibit 55.[4]

Recall, Martinez's mother and sister testified that they met with Cristina but did

not discuss Martinez or any admission. The State recalled Cristina and asked whether she

understood that Martinez had admitted the allegations. Martinez objected, the court sent

the jury out, and the parties agreed Cristina's answer was admissible under ER 613(b) for

impeachment only. Defense counsel requested the court to issue an oral instruction to

that effect, rather than a written instruction. Later, during deliberations, the jury

expressed confusion about the oral instruction and tied the instruction to the impeachment

testimony *and* exhibit 55. The court and counsel agreed the jury was confused and likely

misunderstood the oral instruction. With this backdrop, we discuss Martinez's argument

on appeal that his trial counsel should have proposed a written limiting instruction to

clarify the law for the jury.

Whether to request a limiting instruction is a matter of trial tactics. *State v.

Yarbrough*, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009). Sometimes a confused jury is a

---

[4] Martinez additionally argues that defense counsel might have drafted a customized instruction weaving the standard limiting instruction language into the facts of the case. Weaving a standard instruction into the facts of a specific case risks commenting on the evidence. We question whether a customized instruction would have been appropriate.

good thing for a defendant who hopes the State has not proved its case beyond a reasonable doubt. This is especially true here, where exhibit 55 seems not to bolster the State's case, but instead neutralize it. Martinez's text message to his aunt admitted nothing. He just wanted to talk with her. If anything, the text message seems to bolster what Martinez's mother and sister said—that Martinez had admitted nothing.

We cannot say that defense counsel's decision not to ask for a written limiting instruction was an unreasonable tactical decision, given the jury's confusion. Confusion could have led to an acquittal or at least a mistrial.

3.    PROSECUTORIAL MISCONDUCT DURING CLOSING

Martinez contends the prosecutor committed misconduct during closing argument by misrepresenting P.R.'s testimony that the abuse happened "all the time," just as often as it happened to H.C. and that it started before she could remember. RP at 762. He argues this conduct warrants reversal of the "pattern of sexual abuse" findings with respect to P.R. and his convictions. We agree in part.

In closing arguments, prosecutors have wide latitude in presenting their characterization of the evidence and the inferences the facts suggest. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 169, 410 P.3d 1142 (2018); *State v. Thorgerson*, 172 Wn.2d 438, 454, 258 P.3d 43 (2011). To establish prosecutorial misconduct, Martinez must

demonstrate that the prosecutor's remarks in closing argument were both improper and

prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). To show

prejudice, a defendant must establish "'a substantial likelihood [that] the instances of

misconduct affected the jury's verdict.'" *Thorgerson*, 172 Wn.2d at 442-43 (alteration in

original) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174,

191, 189 P.3d 126 (2008)). In considering whether prosecutorial misconduct warrants

reversal, we do not view the improper comments in isolation but rather examine them in

the context of the entire case. *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551

(2011). We address Martinez's contentions by dividing the instances into objected-to

comments and unobjected-to comments.

*Objected-to Comments*

The defense objected to the prosecutor's comment that the abuse "happened all the

time, 20 to 50 times for [H.C.], just as many for [P.R.]." RP at 766. This statement was

improper; it was not a reasonable inference from the evidence. In fact, P.R. repeatedly

stated she could only remember the three times she described.

It is evident that the jury believed the two accusers. H.C. testified Martinez

molested her 20 to 50 times from when she was 8 until she was 12 or 13. On the other

hand, P.R. could recall only three times Martinez molested her, twice in the Martinez

27

house when she was 5 or 6, and once in the house that Martinez shared with his girlfriend in 2017, when she would have been 13.

With respect to each of the two first degree molestation counts involving P.R., the State had to prove beyond a reasonable doubt that the charged offense was part of "an ongoing pattern of sexual abuse of the same victim . . . manifested by multiple incidents over a prolonged period of time." RCW 9.94A.535(3)(g). But P.R. testified to only two instances of molestation when she was under 12[5]—one was charged in count 3 and the other was charged in count 4. Had the jury relied on P.R.'s testimony rather than the prosecutor's mischaracterization of evidence, it could not have found the presence of the aggravators with respect to count 3 and count 4. We conclude there is a substantial likelihood that the prosecutor's mischaracterization of the evidence prejudiced Martinez. We remand for the trial court to vacate the jury's special verdict findings with respect to count 3 and count 4 and to resentence Martinez.

Martinez additionally argues that the prosecutor's mischaracterization of the evidence "invited the jury to cumulate evidence—exactly what the jury is *not* supposed to do when evaluating charges joined for trial." Appellant's Am. Br. at 49. Again, it is

---

[5] Child molestation in the first degree occurs when the victim is less than 12 years old. RCW 9A.44.083.

28

evident the jury believed both accusers. We cannot say whether this is because of the jury's proper evaluation of the evidence or because of the prosecutor's mischaracterization of P.R.'s testimony. For this reason, we cannot say there is a substantial likelihood that the prosecutor's misconduct resulted in Martinez's four convictions.

*Unobjected-to Comments*

When a defendant fails to object to an improper comment, the error is waived unless the remark was so flagrant and ill intentioned as to cause enduring and resulting prejudice that a curative instruction could not have remedied. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). Misconduct meets this standard in a narrow set of cases, where a jury could draw improper inferences from comments on a defendant's race or membership of a group or when a prosecutor's remarks are particularly inflammatory. *Phelps*, 190 Wn.2d at 170. We focus less on whether the conduct was flagrant and ill intentioned and more on whether the prejudice could have been cured with an instruction. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The test is whether the misconduct crosses a line that threatens the fundamental fairness of the trial. *Phelps*, 190 Wn.2d at 171.

29

Here, Martinez did not object when the prosecutor said P.R. "knew it started

before this first time that she could remember," and said "this was going on all the time."

RP at 760-61, 762. To the extent these unobjected-to remarks are not supported by P.R.'s

testimony, they are not the type of remarks that qualify for review. They do not relate to

race nor are they particularly inflammatory. For this reason, we will not review this claim

of error.

4.     CUMULATIVE ERROR

Martinez contends the cumulative effect of the errors outlined above deprived him

of a fair trial. We disagree.

"The cumulative error doctrine applies where a combination of trial errors denies

the accused a fair trial even where any one of the errors, taken individually, may not

justify reversal." *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). Here, we

have not found any nonprejudicial trial errors. The doctrine of cumulative error does not

apply.

No. 37150-6-III
*State v. Martinez*

Affirm the convictions but remand to vacate two aggravator findings and for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Siddoway, J.

31