IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38684-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MIREY CRUZ HERNANDEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Mirey Cruz Hernandez appeals his conviction for

assault in the second degree with a deadly weapon enhancement. He raises two

arguments on appeal—error in not suppressing his statements to law enforcement and

prosecutorial misconduct. The first is unpreserved, and the second fails. We affirm.

FACTS

Isidro Rodriguez Mellado[1] worked at an apple orchard in Grant County, where he

picked apples part of the year. He met Mirey Cruz Hernandez while working in the

---

[1] We refer to Mr. Rodriguez by his primary last name. At trial, he stated that his primary last name is Rodriguez.

orchards five years earlier. Mr. Rodriguez leased an apartment in Mattawa, which he allowed Mr. Cruz Hernandez to occupy with him. Both men speak Spanish.

On September 1, 2021, Mr. Rodriguez went to work in the morning, then returned to his apartment. When he arrived home, Mr. Cruz Hernandez asked him how his day was. Mr. Rodriguez responded that he was a little tired and that he had fallen short of picking four bins of apples. Then, as he set his lunchbox down in the kitchen, Mr. Cruz Hernandez said, "I'm going to pay you back for what you did to me," then lunged at him with a knife three times, stabbing him above his stomach on the third attempt. Rep. of Proc. (RP) (Dec. 1-3, 2021) at 252. Afterward, while still bleeding, Mr. Rodriguez grabbed a chair to defend himself, then backed away and left the apartment.

Mr. Rodriguez then drove himself to a clinic in Mattawa. There, he told the clinic staff that a friend assaulted him in the orchards; he did not want to implicate Mr. Cruz Hernandez because he did not want to cause him any legal trouble. Based on a report from the clinic, Mattawa Police Department Officer Alexandro Herrera Zesati and Grant County Sheriff's Deputy Jesse King began investigating the stabbing. Mr. Rodriguez was taken to a hospital in Richland, where he stayed for one night.

2

The next day, September 2, Mr. Rodriguez took an Uber from the hospital to the clinic to pick up his car. His Uber driver asked about what happened and told him she thought it would be a mistake to let the person who stabbed him get away with it.

Once Mr. Rodriguez got his car from the clinic, he drove to his apartment where he ran into the apartment manager, Jose Fernandez. He told Mr. Fernandez that Mr. Cruz Hernandez had assaulted him. At that moment, Mr. Cruz Hernandez came out of the apartment. He approached, asked Mr. Rodriguez why he had not slept at home, and said that he was going to see a friend for a few minutes. Mr. Cruz Hernandez left and, at that time, Mr. Rodriguez called police and told them that he was stabbed by Mr. Cruz Hernandez in his apartment.

*Investigation*

On September 1, the day of the stabbing report, Officer Zesati responded to the clinic to take pictures of Mr. Rodriguez's stab wound. Meanwhile, Deputy King drove to an orchard outside of Mattawa city limits to investigate. When he arrived at the orchard, he found no one to speak with, so he went to a neighboring orchard and was told that workers had gone home for the day.

He resumed the investigation the next day, September 2. He returned to the orchard and spoke with a field manager and owner and asked about the stabbing. He

3

then drove to the Mr. Rodriguez's apartment. When he arrived, he saw what appeared to be blood on the ground leading from a parking spot to the door of the apartment. He knocked on the apartment door and received no response, so he left to meet with Officer Zesati to figure out a plan.

Officer Zesati knew Mr. Fernandez and contacted him to see if he would let the officers into the apartment. Both officers met Mr. Fernandez at the apartment building. Once Officer Zesati arrived, he saw what appeared to be a blood trail from the parking lot up to Mr. Rodriguez's apartment. The trio walked up to the apartment and Mr. Fernandez knocked on the door.

*Body camera video*

The next five minutes of the interaction were recorded by Deputy King's body camera. Video of the interaction first shows the officers and Mr. Fernandez walk up to the apartment door on the second floor of the building. Once at the door, Mr. Fernandez knocks, asks for "Eddie," then says "open the door" in Spanish. Ex. 20, at 49 sec. through 58 sec. A man who later identifies himself as Mr. Cruz Hernandez opens the door and says something inaudibly, an officer asks how he is doing, then Mr. Fernandez says "he says you guys can come in." Ex. 20, at 1 min., 7 sec. through 1 min., 27 sec. Before the officers enter, Deputy King asks Mr. Fernandez to tell Mr. Cruz Hernandez

4

that he is recording the interaction. Once inside the apartment, Officer Zesati translates Deputy King's questions and Mr. Cruz Hernandez's answers.

As Mr. Cruz Hernandez lets the officers and Mr. Fernandez into the apartment, Deputy King asks if he saw anything with Mr. Rodriguez. Mr. Cruz Hernandez denies seeing Mr. Rodriguez. He then confirms his name after Deputy King asks, then walks to the kitchen to get identification at Deputy King's request. One of the men then asks Mr. Cruz Hernandez when he last saw Mr. Rodriguez. He responds that the last time he saw Mr. Rodriguez was the day before yesterday.

Deputy King then asks Mr. Cruz Hernandez to "sit down for me for a sec.," which he does. Ex. 20, at 2 min., 13 sec. through 2 min., 26 sec. Deputy King then asks whether he worked with Mr. Rodriguez at the orchard and if there had been issues between the two. Mr. Cruz Hernandez responds that they worked together and that he had not seen Mr. Rodriguez since Tuesday. Deputy King then asks if he is aware of what happened to Mr. Rodriguez, then says "sounds like he got stabbed with a knife and I'm trying to figure out if you know anything about that." Ex. 20, at 3 min., 37 sec. through 3 min., 51 sec. Mr. Cruz Hernandez tells the officers he does not know anything about the stabbing. Deputy King asks if he noticed the blood coming from the apartment to the outside. Mr. Cruz Hernandez responds that he did not notice the blood outside because

5

his car is broken and he has not left. He also tells the officers that Mr. Rodriguez should have told investigators who stabbed him. Deputy King then asks to speak with Officer Zesati outside of the apartment and walks toward the door and the video ends.

After leaving the apartment, Officer Zesati met with Mr. Rodriguez to get a statement. Later that day, Officer Zesati returned to the apartment to have Mr. Rodriguez show him the knife that Mr. Cruz Hernandez used to stab him. The knife was located in the kitchen sink, inside a clear glass, which was filled with water. The blade was approximately four and one-half inches long. It was identifiable because it was one of two knives in Mr. Rodriguez's kitchen and because the tip was broken. Officer Zesati packaged the knife and sent it to the Washington State Patrol Crime Laboratory, but it was never tested for deoxyribonucleic acid (DNA) or fingerprint evidence.

*Procedure*

The State charged Mr. Cruz Hernandez with assault in the first degree and assault in the second degree, both with deadly weapon enhancements. Mr. Cruz Hernandez pleaded not guilty.

*CrR 3.5 suppression hearing*

Before trial, the court held a CrR 3.5 hearing, which is required when a statement

of an accused is to be offered in evidence at trial. CrR 3.5(a). The State called both

Deputy King and Officer Zesati to testify about their interview with Mr. Cruz Hernandez.

Deputy King testified he did not give *Miranda*[2] warnings before asking questions. Both

officers testified they did not handcuff Mr. Cruz Hernandez, tell him he was not free to

leave, or tell him that he had to talk to them. Defense counsel waived argument during

the hearing and made no objection to the statements or their admissibility. The body

camera video was not played during the suppression hearing nor was it discussed.

> The trial court admitted the statements, explaining:
>
> [Those appear] to be voluntary statements. Based on the facts that [Mr.
> Cruz Hernandez] was not in restraints, he was not told he was under arrest,
> he was not told he was not free to leave, and [the officers] did not curtail his
> movement, I find that this was not a case where Miranda was necessary, and
> so the Miranda did not have to be provided to the defendant, and based on
> that the statements are admissible under Rule 3.5.

RP (Nov. 4, 2021) at 20-21. The court later entered findings of fact and conclusions of

law after defense counsel stated he agreed with them and had no objections to their entry.

In relevant part, the court concluded:

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

1. The court finds the defendant was not in custody in the apartment when statements were made by the defendant, and *Miranda* warnings were not needed.
2. The court finds the defendant's statements were made freely and voluntarily.
3. The court finds that the statements made by the defendant inside of the apartment are admissible at trial.

Clerk's Papers (CP) at 9-10. The trial court later heard argument on defense counsel's motions in limine, none of which concerned Mr. Cruz Hernandez's statements to the officers in his apartment.

*Voir Dire*

During voir dire, the prosecutor asked potential jurors questions, including a series of questions of whether they thought television shows like *Crime Scene Investigation* (*CSI*) realistically portrayed criminal investigations.

*Trial*

During trial, the State called both Officer Zesati and Deputy King to testify about their involvement with the investigation and about their interaction with Mr. Cruz Hernandez inside his apartment. Officer Zesati testified that he noticed a strong and obvious odor of "Clorox" inside the apartment. RP (Dec. 1-3, 2021) at 206. Deputy King similarly testified that the apartment smelled like "fresh bleach." RP (Dec. 1-3, 2021) at 240.

The State next called Mr. Rodriguez to testify. He recounted getting off work, Mr. Cruz Hernandez stabbing him, and then obtaining medical treatment. He testified that Mr. Cruz Hernandez was well organized and cleaned during their time living together, but that the smell of bleach when he returned to the apartment with the officers was unusually strong and out of the ordinary.

The State next called Mr. Fernandez to testify. He testified that he works for the Grant County Housing Authority and is the site manager for the apartment complex where Mr. Rodriguez lives. He testified that he walks around the apartment buildings daily to check for damage. During his walk-through on September 1, he noticed blood on the sidewalk outside Mr. Rodriguez's apartment. On September 2, Officer Zesati called and told him someone had been injured inside Mr. Rodriguez's apartment. He also testified about accompanying the officers to Mr. Rodriguez's apartment and that Mr. Cruz Hernandez let them inside.

Last, the State called Gilberto Gonzalez, the foreman of the apple orchard, to testify. He testified that he saw Mr. Rodriguez leaving work on September 1 and that he did not appear to be injured or stabbed.

After the State rested, defense counsel called Officer Zesati to testify. During his testimony, defense counsel moved to admit and play the video from Deputy King's body camera. The court admitted and played the entire video.

Defense counsel next called Mr. Cruz Hernandez to testify. During direct examination, he testified he did not stab Mr. Rodriguez. He testified he saw Mr. Rodriguez on August 31, before work. During cross-examination, he testified he did not go to work in the orchards on September 1. Instead, he testified he stayed inside the apartment that day because his car was broken. He also testified he had not seen Mr. Rodriguez in two days, since August 30, which was inconsistent with his statement during direct examination. He testified he went to visit a friend the next day, September 2, but that he did not see the blood on the concrete. When asked about cleaning the apartment with Clorox, he stated "I clean every day." RP (Dec. 1-3, 2021) at 323.

*Defense closing and State rebuttal*

During defense counsel's closing argument, he again referred to the body camera video and emphasized that Mr. Cruz Hernandez was acting normal when he was questioned by the officers. He also criticized the State's decision not to test the knife or blood stains outside the apartment for DNA evidence.

The prosecutor then gave a rebuttal closing argument and explained why he had

decided not to test the knife for DNA evidence, and why he believed the evidence

presented supported conviction.

The jury found Mr. Cruz Hernandez guilty of assault in the second degree, together

with the deadly weapon enhancement, and acquitted him of assault in the first degree.

The trial court sentenced him to 18 months of confinement, inclusive of a 12-month

weapon enhancement, and 18 months of community custody.

Mr. Cruz Hernandez timely appealed.

## ANALYSIS

*SUPPRESSION OF STATEMENTS TO LAW ENFORCEMENT*

Mr. Cruz Hernandez contends the trial court erred by failing to suppress the

statements he made to law enforcement. The State raises multiple responses, including

that we should not review this issue because Mr. Cruz Hernandez never objected at trial

to the admission of his statements to the officers. We agree.[3]

Failure to raise an issue before the trial court generally precludes a party from

raising it on appeal. RAP 2.5. "Although this rule insulates some errors from review, it

---

[3] We note that Mr. Cruz Hernandez, himself, had the recorded interview admitted as part of his case—probably to show his calm demeanor and his suggestion to the investigating officers that they ask Mr. Rodriguez who stabbed him.

encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important policies of economy and finality." *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). Although RAP 2.5(a) sets forth exceptions to this rule, Mr. Cruz Hernandez does not argue that any exception applies. We therefore decline to address this unpreserved claim of error.

### PROSECUTORIAL MISCONDUCT

Mr. Cruz Hernandez contends the prosecutor committed misconduct in voir dire and closing arguments. We disagree.

The defendant bears the burden of showing that the prosecutor's comments were improper and prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). However, where, as here, the defendant fails to object or request a curative instruction at trial, the issue of misconduct is waived unless the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). Under this heightened standard, the defendant must show that (1) "'no curative instruction would have obviated any prejudicial effect on the jury'" and (2) the misconduct resulted in prejudice that "'had a substantial likelihood of affecting the jury verdict.'" *State v. Emery*, 174 Wn.2d 741,

12

761, 278 P.3d 653 (2012) (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). The focus should be less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured. *Id*. at 762.

Here, Mr. Cruz Hernandez points to two instances of alleged misconduct by the prosecutor: (1) voir dire questions about the television show *CSI*, and (2) the rebuttal closing argument about forensic testing and *CSI*. We disagree and discuss each separately.

### *The prosecutor's voir dire questions*

First, Mr. Cruz Hernandez argues that the prosecutor's questions about *CSI* in voir dire asked the jury to discount the State's burden to prove the charged crimes beyond a reasonable doubt. He did not raise this argument below; thus, he argues that the comments were flagrant and ill intentioned.

Mr. Cruz Hernandez assigns error to the following comments that the prosecutor made to potential jurors during voir dire:

> Anyone in here seen the TV shows like CSI? Yeah, we've got pretty much everyone. Yeah. So CSI Las Vegas or CSI Miami, something like that, right?
> Okay. Just as a general question, do you think it would be fair to say that there's not a CSI Grant County?
> . . . .

13

> Okay. The investigations that we see kind of on TV shows and stuff, is it fair to say that you don't believe that some of that stuff actually happens? [L]et me ask this question this way instead: Throughout the trial we're going to be putting on different pieces of evidence, and I want to make sure that you are able to hear the evidence presented and only make your decisions based on the evidence as it is laid out throughout this trial. Is everyone able to do that?

RP (Dec. 1-3, 2021) at 59.

We are not persuaded that the prosecutor was attempting to shift, reduce, or misstate the State's burden based on these voir dire questions so as to constitute misconduct. Even had we so found, the jury instructions or a curative instruction would have corrected the prosecutor's questions. In fact, the prosecutor's last question quoted above is nearly identical to the first line of the jury instruction 1, which both parties agreed on: "It is your duty to decide the facts in this case based upon the evidence presented to you during this trial." CP at 22. Further, jury instruction 4 provided the correct burden of proof to the jury: "The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements." CP at 27. Jurors are presumed to follow the jury instructions. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018). The jury instructions would have corrected any alleged

14

confusion based on the prosecutor's *CSI* questions; thus, a curative instruction would have also cured any confusion stemming from the prosecutor's questions.

### *The prosecutor's rebuttal closing argument*

Second, Mr. Cruz Hernandez argues that the prosecutor's rebuttal closing arguments asked the jury to discount the State's burden and asked the jury to speculate about what the knife and the blood trail on the concrete might have shown had they been tested. He also did not raise this argument below; thus, he argues that the comments were flagrant and ill intentioned.

In the context of closing arguments, the prosecuting attorney has "wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006). This is especially so where, as here, the prosecutor is rebutting an issue the defendant raised in his closing argument. *State v. Jones*, 71 Wn. App. 798, 809, 863 P.2d 85 (1993). It is not misconduct for the prosecutor to fairly respond to defense counsel's argument or to argue that the evidence does not support the defense theory. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Misconduct does occur when a prosecutor references evidence outside the record or asks the jury to speculate what the evidence might show. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). We review allegedly improper

15

comments in the context of the entire argument, the issues in the case, and the instructions

given to the jury. *Id.*

Mr. Cruz Hernandez points to the following remarks by the prosecutor to evidence

his arguments:

> We'll talk about the knife first. [Defense counsel] stated a decision was made as to not test the knife. That's true. As prosecuting—as a deputy prosecutor, we make lots of judgment calls every day. The evidence that we had before us was that both [Mr. Rodriguez] and [Mr. Cruz Hernandez] admitted . . . that they were living together, at least for some time. It's likely the knife would have come back with DNA from both of them anyways. So a decision on my part was made to just not have the knife tested.
>
> Also, with that was the conclusion that the reports and testimony from officers were that—was that the apartment smelled like bleach as if it had been cleaned. And you heard that testimony today (sic), so again, the decision was made.
>
> I'd also note, you know, we mentioned at the beginning of all this about whether or not there existed a CSI Grant County, and, you know, the officers did not tear up the concrete and get the blood trail tested for the victim's blood.
>
> However, what we have is the evidence that I pointed out to you, that we know that that trail was not there on—that the blood trail was not there on Tuesday, and it was there on Wednesday.

RP (Dec. 1-3, 2021) at 393-94. Mr. Cruz Hernandez argues that these statements asked

the jury to discount the State's burden by telegraphing to the jury that the State did not

need to test forensic evidence because this was only a Grant County case. The State

argues that the prosecutor was simply trying to manage juror expectations by referencing

his voir dire comments about making a decision based on the evidence as it is and not as they might have seen it in a television show like *CSI*.

We agree with the State. Considering the prosecutor's comments in the context of the entire argument, they did not reduce the State's burden of proof. Instead, they seem to refer back to his voir dire question about deciding the case based on the evidence presented. Regardless, if we had found that the comments were an attempt to shift or reduce the burden, they could have been cured by the jury instructions quoted above or by a curative jury instruction.

Mr. Cruz Hernandez also argues that the prosecutor's comments asked the jury to speculate that any test results of the knife, had it been tested, would have supported the State's case. We disagree.

The prosecutor's rebuttal arguments quoted above seem to be responsive to defense counsel's closing argument. Defense counsel argued in closing:

> There was, you know, no investigation done as to the blood stains, whose blood they were, no samples were taken for DNA analysis of those blood stains. A knife was seized from the apartment. It was a very serious crime and the state wants you to believe that that's the murder weapon—or not the murder weapon, but the weapon used in the assault. Okay. You'd think that they would test it, right? DNA, blood, fingerprints.
> But what happens instead? A decision is made by the state not to test the weapon. That's the kind of thing that you do when you've already made up your mind, you've accused someone, you don't want to be confused by any other facts that might contradict your conclusion. That's

17

called confirmation bias.  They've already made up their mind my client's guilty, why bother testing?  Well, what the test might have shown, perhaps, who knows, it might have shown that another person's fingerprints were on that knife, it might have shown that a third person's DNA was present.  We'll never know, because it was never tested.

RP (Dec. 1-3, 2021) at 391-92.

Considering the prosecutor's rebuttal in the context of the entire argument, including defense counsel's closing argument, we do not find that the prosecutor's comments about not testing the knife amount to misconduct.  The prosecutor did not ask the jury to speculate about what DNA might have been on the knife.  Instead, the prosecutor was responding to defense counsel's argument, which asked the jury to speculate about what forensic tests might have shown.

It is not misconduct for the prosecutor to fairly respond to defense counsel's argument or to argue that the evidence does not support the defense theory.  *Russell*, 125 Wn.2d at 87.  This is what occurred here.  The prosecutor specifically states that he is responding to defense counsel's argument about the decision not to test the knife or blood trail, then explains that he made the decision because the knife would probably show both men's DNA because they lived together, regardless of the stabbing.  The prosecutor followed up by reminding jurors about the actual evidence in the record.

18

No. 38684-8-III
*State v. Cruz Hernandez*

Considering that the prosecutor is allowed to draw all reasonable inferences from the evidence, especially in rebuttal closing argument, we do not find the prosecutor's arguments here amounted to misconduct.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Lawrence-Berrey, A.C.J._
Lawrence-Berrey, J.

WE CONCUR:

_Fearing, J._
Fearing, C.J.

_Pennell, J._
Pennell, J.

19