# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56596-0-II |
| Respondent, | |
| v. | |
| ANDREW KAYNE WINDROW, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, A.C.J. — Mary Rae Bettger was attacked early one morning. Bettger identified Andrew Kayne Windrow as her assailant for the first time at Windrow's trial for second degree assault. A jury convicted Windrow.

Windrow appeals. He argues that the trial court abused its discretion by overruling his objection to the in-court identification procedure. He also contends that the prosecutor committed misconduct through the identification procedure and that his attorney provided ineffective assistance. Windrow asserts that cumulative errors require a new trial. He also filed a statement of additional grounds for review (SAG) arguing that a towing company unlawfully sold his vehicle.

We affirm Windrow's conviction. We decline to address Windrow's SAG because it is not a matter related to the decision under review.

## FACTS

### I. BACKGROUND

Around 4:00 a.m. one morning, Bettger drove to the beach to look at the stars. When she neared the beach, Bettger saw a vehicle approaching from the other direction and stopped to let it pass. As it approached, the vehicle veered over and struck the front driver's side of Bettger's vehicle. The vehicle then backed up and a man leaned out of the driver's window. The man yelled at Bettger and struck at her vehicle several times with what Bettger believed was a machete.

Bettger turned her car around and fled. The vehicle pursued Bettger for several blocks before ramming her and sending her off the road. By the time Bettger got out of her car, the other vehicle was gone. Bettger sought help from residents in the area who called 911. While Bettger sat in the emergency aid vehicle, she heard yelling outside that sounded similar to the man that struck her vehicle.

Deputy Nicholas Zimmerman investigated the incident. He observed damage to Bettger's vehicle that included several six-inch dents near the driver's window. He also noticed debris nearby that was different from the color and damaged parts of Bettger's vehicle. At the beach approach, Zimmerman found a damaged front bumper and a license plate. The bumper had "Subaru" printed on it and was marred with blue paint the same color as Bettger's vehicle. The foam lining for the bumper matched the debris found near Bettger's vehicle. Zimmerman traced the license plate to a 1999 silver Subaru Legacy registered to Windrow.

Later that day, Zimmerman found Windrow in the driver's seat of a silver 1999 Subaru Legacy. The car's rear license plate matched one found at the beach approach. The car had substantial front-end damage. Windrow asked Zimmerman for a jump start because his car's

battery was dead. The damage to Windrow's car included missing the entire front bumper and the alternator belt, which charges the car battery.

After jumping Windrow's car, Zimmerman obtained a statement from Bettger. Zimmerman never showed Bettger a photo of Windrow or a photo lineup of her suspected assailant. And he never confirmed with Bettger that she saw Windrow driving the Subaru. Zimmerman then arrested Windrow. During the arrest, Zimmerman found an 18 to 20-inch-long hatchet in Windrow's car. The blade of the hatchet was consistent with the marks on Bettger's car.

The State charged Windrow with one count of second degree assault and one count of second degree malicious mischief.

## II. TRIAL

At trial, Bettger identified Windrow as her assailant for the first time:

[PROSECUTOR:] Can you point to the person that you recognize as the person who assaulted you on that evening?
[BETTGER:] (No audible response.)
[PROSECUTOR:] Can you identify this person?
[BETTGER:] I—I don't know that I absolutely can, unless the hair cut and that—the positioning—
[PROSECUTOR:] Is there anything—
[BETTGER:] —were exactly the same.
[PROSECUTOR:] Describe the person that you saw that night?
[BETTGER:] Someone with brown-ish hair, a little shaggy, a little longer. Kind of a—I don't know, a look of maybe rage on the face. That—
[PROSECUTOR:] Do you recognize anyone here in the courtroom that you believe to be the person that assaulted you that night?
[BETTGER:] I don't—
[DEFENSE COUNSEL]: Objection; leading and asked and answered.
THE COURT: I'll sustain as to leading.
[PROSECUTOR:] Do you see the man who hit you in the courtroom here today?
[DEFENSE COUNSEL]: Objection; asked and answered.
[PROSECUTOR:] That you can identify?
THE COURT: It's been objected to. I don't think the witness has had an opportunity to answer that question. I'll overruled the objection.

3

> [BETTGER:] The man at the bench?
>
> [PROSECUTOR:] Can you point?
>
> [BETTGER:] (Witness complies.)
>
> . . .
>
> [PROSECUTOR]: And let the record reflect that the witness has identified the Defendant, Andrew Windrow.

Report of Proceedings (RP) at 73-74.

On cross-examination, Bettger acknowledged that she never identified Windrow as her assailant in the three months since the incident, at one point stating, "I had no idea who hit me." RP at 76. On redirect examination, she explained that she identified Windrow for the first time that day because no one had ever asked her to identify her assailant before.

After the State rested, Windrow moved to dismiss the malicious mischief charge. The court granted the motion and dismissed the charge.

In closing argument, defense counsel conceded that Windrow's vehicle was used to assault Bettger. But counsel argued that Bettger's weak identification of Windrow as her assailant meant the State failed to prove beyond a reasonable doubt that Windrow was the driver. Through jury instruction 11, which addressed factors affecting the weight the jury should give eyewitness identification testimony, counsel argued that Bettger's identification was not credible in part because Bettger struggled to identify her assailant in the courtroom.

The jury convicted Windrow of second degree assault and the trial court sentenced him to 50 months of confinement. Windrow appeals his conviction.

## ANALYSIS

### I. EVIDENTIARY RULING

Windrow argues that the trial court abused its discretion and denied him his right to a fair trial by overruling his "asked and answered" objection to Bettger's in-court identification. Br. of

Appellant at 3, 12-17. He reasons that the in-court identification procedure was impermissibly suggestive and it was the only direct evidence that he was the driver. Because Windrow challenges the identification on the ground that it was impermissibly suggestive for the first time on appeal and has not demonstrated a manifest error affecting a constitutional right, we decline to review this issue.

A.      Preservation for Review

RAP 2.5(a) authorizes this court to "refuse to review" any alleged error not raised in the trial court, unless the claimed error relates to a lack of trial court jurisdiction, the failure to establish facts upon which relief could be granted, or a manifest error affecting a constitutional right.

Windrow did not preserve the error below. He objected to the identification procedure on the grounds that Bettger already answered that she could not identify her assailant in the courtroom. At no point in our record of proceedings below did Windrow ever assert that the identification procedure was impermissibly suggestive. Thus, we may decline to review this issue unless he meets one of the RAP 2.5(a) exceptions. Windrow's contention does not target the RAP 2.5(a) exceptions of trial court jurisdiction or the failure to establish facts meriting relief, so he must demonstrate a manifest error affecting a constitutional right.

B.      Manifest Error

A party demonstrates manifest constitutional error by showing that the issue affects their constitutional rights and that they "suffered actual prejudice." *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020), *review denied*, 195 Wn.2d 1025 (2020). To demonstrate actual prejudice, the defendant must make a plausible showing that the claimed error had practical and identifiable consequences in the trial. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009).

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 to the Washington Constitution guarantee criminal defendants the right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). In particular, "the due process clause of the Fourteenth Amendment compels exclusion of eyewitness identification evidence" that was "obtained by an unnecessarily suggestive police procedure" and "lacks reliability under the totality of circumstances." *State v. Derri*, 199 Wn.2d 658, 673, 511 P.3d 1267 (2022); *see Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

Under *Brathwaite*, Windrow must establish by a preponderance of the evidence that the identification procedure was "unnecessarily suggestive." *Derri*, 199 Wn.2d at 674. "Generally, courts have found [out-of-court] lineups or montages to be impermissibly suggestive solely when the defendant is the only possible choice given the witness's earlier description." *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). If Windrow fails to show that the identification procedure was impermissibly suggestive, the inquiry ends. *Id.*

Here, Windrow has not shown that the identification procedure was impermissibly suggestive. Bettger never identified Windrow before his trial, so there was no prior description to rely on where Windrow was "the only possible choice." *Id*. Although Windrow is correct that at trial he was "one of two people at the defense table," Br. of Appellant at 24, both people were men, and our record does not include a physical description of defense counsel or a description of either person's attire. It is standard practice to exclude witnesses from courtrooms before they testify, *see* ER 615, so Bettger would not have known which person was the attorney until counsel began making objections. As discussed above, there is no evidence in our record that Windrow objected to the suggestiveness of the procedure either beforehand or at the time of the identification.

Counsel could have requested a hearing outside the presence of the jury and raised the same contention Windrow now asserts for the first time on appeal. He did not. Thus, Windrow failed to develop the record below showing that the procedure was suggestive. *Derri*, 199 Wn.2d at 674.

Windrow also cannot demonstrate prejudice. Circumstantial and direct evidence are equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). Because the identification occurred in-court, Windrow cross-examined Bettger about the reliability of her testimony and encouraged the jury to find reasonable doubt about her credibility in closing argument. Bettger's identification of Windrow was shaky at best. Even without Bettger's identification, the circumstantial evidence presented at trial supported a strong inference that Windrow was the man who attacked Bettger. Defense counsel conceded that Windrow's car was used to assault Bettger. The day of the assault, police found Windrow in that car, which sustained damage during the assault that would have made it inoperable shortly thereafter due to the lack of an alternator belt to charge the battery. And police found a hatchet inside the car that was consistent with the marks on Bettger's vehicle. Windrow cannot show that he would have been acquitted without Bettger's identification, so he has not demonstrated practical and identifiable consequences in his trial to establish a manifest error. *O'Hara*, 167 Wn.2d at 99.

In sum, Windrow failed to preserve this issue for our review and cannot demonstrate a manifest error affecting a constitutional right. We thus decline to reach this issue.

C.     Overruling Windrow's Objection

To the extent that Windrow argues that the trial court abused its discretion in overruling his second "asked and answered" objection because Bettger previously answered the State's question, Br. of Appellant at 14, we also disagree. We review a trial court's decision to admit

evidence for abuse of discretion, which occurs when the decision is based upon untenable grounds or was made for untenable reasons. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). Bettger did not ever explicitly testify that she could not identify her assailant in the courtroom. She first responded "I don't know that I absolutely can," and her second response was interrupted by defense counsel's objection. RP at 73. Neither response was an unambiguous assertion that she could not identify her assailant. Thus, the trial court did not abuse its discretion in overruling Windrow's second "asked and answered" objection.

## II.    PROSECUTORIAL MISCONDUCT

Windrow argues that the prosecutor committed misconduct because her questioning of Bettger constituted an inadmissible, impermissibly suggestive identification procedure. We disagree.

### A.    Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We will conclude that a defendant who did not object to the prosecutor's conduct at trial "waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. We will "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id*. at 762. The defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

We view a prosecutor's conduct in "the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). Eliciting facts to admit as evidence, then presenting argument based on those facts, is the standard role of the prosecutor. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 166, 410 P.3d 1142 (2018) ("Facts are the responses to the 'who, what, where' questions prosecutors ask at trial.").

B.      Application

As discussed above, Windrow objected to the identification at trial on the sole ground that Bettger had already been asked and failed to identify her assailant. Windrow did not argue below that it was improper for a prosecutor to elicit an identification that, it was later argued, was impermissibly suggestive. We hold that Windrow fails to show that the prosecutor's questioning was flagrant, ill intentioned, or prejudicial.

An in-court identification is admissible evidence if the State can establish by clear and convincing evidence that the in-court admission has "an origin independent of [any] improper identification procedure." *State v. Smith*, 36 Wn. App. 133, 138, 672 P.2d 759 (1983). Here, Bettger never even described the appearance of her assailant before Windrow's arrest and she did not participate in *any* pretrial identification procedure. Knowing this, the prosecutor asked Bettger if she could identify anyone in the courtroom as the man who attacked her. Bettger explained that she was not absolutely certain, stated that she remembered her assailant having "a little longer," "shaggy," "brown-ish hair" and "a look of maybe rage on the face," then pointed at Windrow. RP at 73. As discussed above, Windrow has not provided a sufficient record for us to conclude that the identification procedure was impermissibly suggestive. And it is proper for a prosecutor to

9

elicit a witness's version of events from the witness as long as the manner of questioning is not flagrant or ill intentioned. *Phelps*, 190 Wn.2d at 166. Windrow fails to show that the prosecutor's questioning here was flagrant or ill intentioned, much less prejudicial. We hold that Windrow has waived any alleged error.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Windrow argues that he received ineffective assistance because trial counsel failed to support his objection to Bettger's in-court identification of Windrow with proper authority. We disagree.

Criminal defendants are guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To show ineffective assistance, a defendant must establish that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id*. at 32-33. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id*. at 33. We strongly presume that counsel's performance was reasonable, but defendant may overcome the presumption by showing that no conceivable legitimate tactic explains counsel's decision. *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). When and how an attorney objects is a "classic example of trial tactics." *Id*. at 248. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different. *Id*. at 248. An ineffective assistance of counsel claim fails if a defendant fails to establish either prong. *Grier*, 171 Wn.2d at 33.

Even assuming without deciding that defense counsel provided deficient performance by failing to object that the identification procedure was impermissibly suggestive, Windrow cannot show prejudice. As discussed above, the circumstantial evidence admitted at trial supports a strong inference that Windrow was the driver who assaulted Bettger. There is not a reasonable probability that, but for Bettger's identification of Windrow, the outcome of the proceedings would have been different. Accordingly, we hold that Windrow's ineffective assistance of counsel claim fails.

## IV. CUMULATIVE ERROR

Windrow argues that cumulative errors denied him a fair trial, warranting reversal of his conviction. "[A] defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Windrow fails to show any error, so the cumulative error doctrine does not apply.

## V. SAG

In his SAG, Windrow argues that a towing company unlawfully sold his vehicle. SAG at 1. RAP 10.10(a) provides that on direct appeal, "the defendant may file a pro se statement of additional grounds for review to identify *and discuss those matters related to the decision under review* that the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." (emphasis added). Windrow's SAG does not discuss a matter related to the decision under review because it does not relate to the elements of second degree assault or call his conviction into doubt. Windrow's argument is better addressed in the civil realm. Accordingly, we decline to address his argument.

11

No. 56596-0-II

We affirm Windrow's conviction.

_____
Cruser, J.

We concur:

_____
Glasgow, C.J.

12

VELJACIC, J. (concurring) — I agree with my colleagues in the majority that under current applicable law, in light of the arguments made by the parties, the conviction should be affirmed. I write separately because I cannot help but be troubled by the in-court identification procedure utilized here where it was the first identification procedure undertaken by the State.

The typical in-court identification occurs *after* an identification procedure during law enforcement's investigation. The purpose of the in-court identification is to answer the relevant question of whether the individual in court is the same individual previously identified. But when the in-court identification is the first presentment of the alleged perpetrator to the eyewitness, the procedure has a high likelihood of being impermissibly suggestive. In that context, with the defendant sitting at counsel table, there is little mystery as to who the witness will identify—the person in the defendant's seat.

It may be fairly argued that the witness will identify the person in the defendant's seat because they, in fact, committed the crime. But we would be better served in our credibility as a court system were we to utilize defensible practices that recognize that the person in the defendant's seat may *not* have committed the crime and instead will be identified as the assailant because the witness was provided only one choice of assailant—the person in the defendant's seat.

While we have historically been content to allow a first time identification procedure in open court because it was tested by cross-examination in the presence of the jury and was, therefore, as good as we could do, I disagree that continuation of this historical practice is the best course in light of what we now know about memory and identification. *See, e.g.,* Aliza B. Kaplan & Janis C. Puracal, *Who Could It Be Now? Challenging the Reliability of First Time In-Court Identifications after* State v. Henderson *and* State v. Lawson, 105 J. CRIM. L. & CRIMINOLOGY

947, 959 (2015) ("Studies indicate that faces are often forgotten only a few hours after an event, and that after one day, the recall of a 'strangers' age, hair color, and height [is] usually inaccurate.'" (alteration in original) (quoting Jessica Lee, Note, *No Exigency, No Consent: Protecting Innocent Suspects from the Consequences of Non-Exigent Show-Ups*, 36 COLUM. HUM. RIGHTS. L. REV. 755, 771 (2005))); Samantha L. Oden, Note, *Limiting First-Time In-Court Eyewitness Identifications: An Analysis of* State v. Dickson, 36 QUINNIPIAC L. REV. 327, 330 (2018) (stating that more than 70 percent of wrongful convictions overturned by DNA testing in the nation are attributed to eyewitness misidentification); Jennifer L. Overbeck, Note, *Beyond Admissibility: A Practical Look at the Use of Eyewitness Expert Testimony in the Federal Courts*, 80 N.Y.U. L. REV. 1895, 1905 (2005) ("Many eyewitnesses are telling the truth as they recall it; they are simply mistaken. Because they believe they are telling the truth, they are somewhat less vulnerable to cross-examination."); Jack B. Weinstein, *Eyewitness Testimony*, 81 COLUM. L. REV. 441, 443-45 (1981) (book review) (discussing that post-event information and interactions can impact memory).

To understand fully, one need only juxtapose an investigatory identification procedure with an in-court identification procedure. In one type of investigatory identification procedure, moderately sized photos of similarly appearing individuals are sequentially presented with uniform timing by a neutral administrator.[1] *See* Sandra Guerra Thompson, *Beyond a Reasonable Doubt? Reconsidering Uncorroborated Eyewitness Identification Testimony*, 41 U.C. DAVIS L. REV. 1487, 1518-19 (2008) (discussing sequential photo arrays). The witness is given time to respond, can

---

[1] This procedure is the preferred method by the Washington Association of Sheriffs and Police Chiefs. *See* Washington Association of Sheriffs & Police Chiefs, *Model Policies: Eyewitness Identification—Minimum Standards* (May 21, 2015).

have the photos presented repeatedly, and is not pressured to make a selection. Washington Association of Sheriffs & Police Chiefs, *Model Policies: Eyewitness Identification—Minimum Standards* (May 21, 2015). Prior to the presentment, witnesses are advised, at minimum, that the person who committed the crime may or may not be included in the photo lineup, they are not required to make an identification, and the investigation would continue whether or not an identification is made. *Id.*

Here, the witness during the in-court identification was presented with a pool of one—the defendant. (A possible pool of two—if we are counting defense counsel—does not assuage my concern as two is still suggestive, but add that defense counsel is usually excluded from the range of choices because they have a speaking part, which thereby reveals their role as counsel.) The witness, in this case also the victim, is being questioned by the prosecutor—the one party in the room that could fairly be characterized as vindicating the victim's interests. The identification is occurring months after the fact. There is no advice that the witness need not identify anyone in the courtroom, leaving the opposite inference: that the perpetrator is in fact in the courtroom. All this says nothing of the ability of the witness to observe the perpetrator at the time of the crime. The witness was also making the selection in front of the entire court: gallery, jury, attorneys, and judge. An uncertain witness might feel pressured to select the only option; rather than stop the trial to assert that the State had the wrong perpetrator.

A continuation of this practice when it is the very first identification procedure is unwise. This is especially true when we consider the impact of a witness pointing an accusatory finger at the person in the defendant's chair in front of the jury. The gesture is powerful. *See* Oden, *supra*

at 333 ("Some studies indicate that witnesses making eyewitness identifications are believed 79.8% of the time.").

Whether steeped in history or not, we should not sacrifice a low pressure, neutrally administered, sequential lay down of photos comprised of similarly appearing individuals in favor of a high pressure request for a witness to, not simply confirm a prior identification, but rather, for the first time, select from a pool of one.

_____
Veljacic, J.